**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

MATTHEW NIXON and PETER FLEMING, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

POND5, INC.,

Defendant

No. 24-cv-05823 (JLR)

**ORAL ARGUMENT REQUESTED**

# MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS CLASS ACTION COMPLAINT

**GOODWIN PROCTER LLP**

The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel. (212) 813-8800
Fax (212) 355-3333

*Attorneys for Defendant Pond5, Inc.*

# TABLE OF CONTENTS


INTRODUCTION ........ 1

I. BACKGROUND ........ 3

A. Pond5 Offers Media Assets To Professionals For Commercial Use. ........ 3

B. Plaintiffs Allege Pond5 Uses Facebook's Tracking Pixel To Transmit Cookies. ........ 5

C. Plaintiffs Consented To Pond5 Transmitting Their Cookies To Facebook. ........ 6

II. ARGUMENT ........ 7

A. The Complaint Should Be Dismissed Under Fed. R. Civ. P. 12(b)(1) For Lack Of Standing. ........ 7

B. The Complaint Should Be Dismissed Under Fed. R. Civ. P. 12(b)(6) For Failure To State A Claim. ........ 10

1. Plaintiffs' Only Alleged Claim Is Time-Barred. ........ 11

2. Pond5 Is Not A Video Tape Service Provider Under The VPPA. ........ 15

3. Plaintiffs Do Not Allege Disclosure Of PII. ........ 18

4. Plaintiffs Consented To Pond5's Recording And Use Of Information. ........ 20

CONCLUSION ........ 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aldana v. GameStop, Inc.*,
No. 22-CV-7063-LTS, 2024 WL 708589 (S.D.N.Y. Feb. 21, 2024) ....................................17

*Amable v. New Sch.*,
No. 20-CV-3811 (KMK), 2022 WL 1443352 (S.D.N.Y. May 6, 2022) ..................................4

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...........................................................................................................10

*Barclift v. Keystone Credit Servs., LLC*,
585 F. Supp. 3d 748 (E.D. Pa. 2022) ..................................................................................9

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................................................10

*In re Bibox Grp. Holdings Ltd. Sec. Litig.*,
534 F. Supp. 3d 326 (S.D.N.Y. 2021)..................................................................................18

*Brokamp v. James*,
66 F.4th 374 (2d Cir. 2023) .................................................................................................7

*Brooks v. WarnerMedia Direct, LLC*,
No. 23 CIV. 11030 (KPF), 2024 WL 3330305 (S.D.N.Y. July 8, 2024) ...............................21

*Cantu v. Tapestry, Inc.*,
697 F. Supp. 3d 989 (S.D. Cal. 2023)..................................................................................15

*Cantu v. Tapestry, Inc.*,
No. 22-cv-1974-BAS-DDL, 2023 WL 4440662 (S.D. Cal. July 10, 2023) ............................16

*Carroll v. Gen. Mills, Inc.*,
No. 23-cv-1746-DSF-MRWx, 2023 WL 4361093 (C.D. Cal. June 26, 2023)........................16

*Carter v. Scripps Networks, LLC*,
670 F. Supp. 3d 90 (S.D.N.Y. 2023)......................................................................................8

*Clark v. Hanley*,
89 F.4th 78 (2d Cir. 2023) ..................................................................................................14

*Collins v. Pearson Educ., Inc.*,
No. 23 CIV. 2219 (PAE), 2024 WL 895316 (S.D.N.Y. Mar. 1, 2024) ............................19, 20

*Daniel v. Cantrell*,
375 F.3d 377 (6th Cir. 2004) ....................12

*De Sole v. Knoedler Gallery, LLC*,
974 F. Supp. 2d 274 (S.D.N.Y. 2013)....................13

*DiFolco v. MSNBC Cable L.L.C.*,
622 F.3d 104 (2d Cir. 2010)....................3

*Doron Precision Sys., Inc. v. FAAC, Inc.*,
423 F. Supp. 2d 173 (S.D.N.Y. 2006)....................4

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ....................19

*Fteja v. Facebook, Inc.*,
841 F. Supp. 2d 829 (S.D.N.Y. 2012)....................21

*Ghanaat v. Numerade Labs, Inc.*,
689 F. Supp. 3d 714 (N.D. Cal. 2023) ....................20

*Golden v. NBCUniversal Media, LLC*,
688 F. Supp. 3d 150 (S.D.N.Y. 2023)....................17

*HV Assocs. v. PNC Bank, N.A.*,
No. 19-cv-07438 (ALC), 2020 WL 5819559 (S.D.N.Y. Sept. 30, 2020)....................11

*Kyszenia v. Ricoh USA, Inc.*,
583 F. Supp. 3d 350 (E.D.N.Y. 2022) ....................13

*LaFaro v. N.Y. Cardiothoracic Grp., PLLC*,
570 F.3d 471 (2d Cir. 2009)....................11

*Magnoni v. Smith & Laquercia*,
LLP, 701 F. Supp. 2d 497 (S.D.N.Y.2010) ....................3

*Martin v. Meredith Corp.*,
No. 22-cv-04776 (DLC), 657 F. Supp. 3d (S.D.N.Y. 2023) ....................11

*McCarthy v. Barrett*,
804 F. Supp. 2d 1126 (W.D. Wash. 2011)....................9

*Muller–Paisner v. TIAA*,
289 Fed. Appx. 461 (2d Cir. 2008)....................3

*In re Nat. Gas Commodity Litig.*,
337 F. Supp. 2d 498 (S.D.N.Y. 2004)....................12

*Nghiem v. U.S. Dep't of Veterans Affairs*,
451 F. Supp. 2d 599 (S.D.N.Y. 2006)....11

*In re Nickelodeon*,
827 F.3d 262 (3d Cir. 2016)....19

*Osheske v. Silver Cinemas Acquisition Co.*,
700 F. Supp. 3d 921 (C.D. Cal. 2023) ....9

*Papasan v. Allain*,
478 U.S. 265 (1986)....11

*Patsy's Italian Restaurant, Inc. v. Banas*,
575 F. Supp. 2d 427 (E.D.N.Y.2008) ....3

*Salazar v. Nat'l Basketball Ass'n*,
685 F. Supp. 3d 232 (S.D.N.Y. 2023) (Rochon, J.) ....8, 20

*Sejin Precision Indus. Co. v. Citibank, N.A.*,
235 F. Supp. 3d 542 (S.D.N.Y. 2016)....13

*Sellers v. Bleacher Rep., Inc.*,
No. 23-cv-00368-SI, 2023 WL 4850180 (N.D. Cal. July 28, 2023) ....17

*Solomon v. Flipps Media, Inc.*,
No. 22-cv-5508 (JMA)(JMW), 2023 WL 6390055 (E.D.N.Y. Sept. 30, 2023)....18, 19, 20

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)....3

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016)....14

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....7, 8, 9, 10

*United States v. Meregildo*,
883 F. Supp. 2d 523 (S.D.N.Y. 2012)....9

*In re Vizio, Inc., Consumer Priv. Litig.*,
238 F. Supp. 3d 1204 (C.D. Cal. 2017) ....15, 16

*Wilson v. Triller, Inc.*,
598 F. Supp. 3d 82 (S.D.N.Y. 2022)....18, 19

*In re Yahoo Mail Litig.*,
7 F. Supp. 3d 1016 (N.D. Cal. 2014) ....9

**Statutes**

18 U.S.C. § 2710 ........................................................................................................ *passim*

**Other Authorities**

Fed. R. Civ. P. 12(b)(1)........................................................................................................7

Fed. R. Civ. P. 12(b)(6)........................................................................................................10

Defendant Pond5, Inc. respectfully submits this memorandum of law, together with the Declaration of Mark David McPherson, in support of its motion to dismiss the class action complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## INTRODUCTION

This case is fundamentally different from the hundred-plus cases filed in the last couple of years under the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, *et seq*. In nearly all of the other VPPA cases filed recently, plaintiffs challenge an entertainment or news website's use of advertising technology, alleging that the use of the Meta Pixel or a similar web-tracking tool discloses the titles of videos subscribers view in violation of the VPPA.

This case is different in several fundamental respects. First and foremost, Plaintiffs here are not viewing videos for private consumption in their homes. They are, as Pond5 describes its customer base, professional "storytellers" (such as "filmmakers, media organizations, and marketers") who subscribe to a service for the purpose of obtaining and then rebroadcasting audio-visual material (and other material) to public audiences. Plaintiffs' claim is thus far removed from the VPPA's purpose: as the Complaint says, the VPPA was passed in the wake of the nomination of a Supreme Court justice whose video viewing habits had been disclosed by a video tape rental company, and is meant to prevent unauthorized disclosure of videos consumers view "when they are at home." (Compl. ¶ 13 (quoting S. Rep. No. 100-599, at 5 (1988)).)

This difference precludes Plaintiffs from even establishing standing to bring any VPPA claim. Because Plaintiffs seek to apply the VPPA not to their private viewing of videos but to their use of a commercial license to display videos they download to the public, Plaintiffs cannot allege that they suffered any injury to any cognizable privacy interests. That distinguishes this case from cases that have found standing to assert claims brought under the VPPA. Unlike those

cases, where Plaintiffs can point to their in-home viewing habits as a privacy interest, Plaintiffs' inability to point to any privacy interest that was allegedly invaded makes this, at best, a run-of-the-mill case for statutory damages with no injury—the kind of case the Supreme Court has said federal courts lack jurisdiction to hear.

There are other differences, too, all of which compel dismissal of Plaintiffs' claim even if they had standing to bring it:

- Unlike defendants in other cases, Pond5's business expands far beyond selling videos. In the language of the VPPA, it is not "engaged in the business … of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). The stock video footage Pond5 offers its professional storytelling customers is only a component of the larger population of media assets it sells. Pond5 is therefore not a "video tape service provider" within the VPPA's reach.
- Plaintiffs cannot allege that Pond5 disclosed any of their personal information. At most, Plaintiffs allege that Pond5 discloses, through the Meta Pixel on its website, their encrypted Facebook IDs, which does not constitute personal information for purposes of the VPPA.
- Any claim Plaintiffs may have had under the VPPA expired long ago. The statute of limitations for a VPPA claim is two years, and Plaintiffs allege they purchased video content on Pond5's website no more recently than 2020 and 2021. While Plaintiffs allege they could not have known about Pond5's use of the Meta Pixel, the entire Complaint (which rests on no private information or new revelations) shows they could have made the same allegations in 2020 or 2021. Indeed,

Pond5's Privacy Policy, to which they agreed when they created their user accounts, explicitly disclosed Pond5's use of tracking cookies. That was as true in 2020 as it is today.

- Plaintiffs consented to the disclosure about which they complain. As Plaintiffs acknowledge, they purchased video from Pond5. In the process of doing so, they necessarily created a user account and agreed to Pond5's Privacy Policy. That Privacy Policy disclosed to Plaintiffs that Pond5 shares information about their page views and video downloads in the very manner Plaintiffs challenge, and gave Plaintiffs the opportunity to opt out of such sharing.

Based on these numerous defects in Plaintiffs' claim, the Court should dismiss Plaintiffs' lawsuit with prejudice.

## I. BACKGROUND

### A. Pond5 Offers Media Assets To Professionals For Commercial Use.

Pond5 is a "marketplace of media assets" used by professional "filmmakers, media organizations, and marketers worldwide" to "tell stories, share knowledge, and inspire audiences." (McPherson Decl. Ex. A at 1.)[1] The media assets Pond5 offers are integrated into

[1] In ruling on a motion to dismiss, a court may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). A court may also consider a document, even if not incorporated into the complaint or subject to judicial notice, if "the complaint relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint," so long as there is no dispute about the document's "authenticity or accuracy." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (further quotation marks and citations omitted). Courts generally have discretion to take judicial notice of internet material. *Magnoni v. Smith & Laquercia*, LLP, 701 F. Supp. 2d 497, 501 (S.D.N.Y.2010), *aff'd,* 483 F. App'x 613 (2d Cir. 2012); *see also Patsy's Italian Restaurant, Inc. v. Banas*, 575 F. Supp. 2d 427, 443 n. 18 (E.D.N.Y.2008) ("It is generally proper to take judicial notice of articles and Web sites published on the Internet."), *aff'd*, 658 F.3d 254 (2d Cir. 2011). The Court may take judicial notice of the fact that a publicly accessible website contains certain information. *See, e.g.*, *Muller–Paisner v. TIAA*, 289 Fed. Appx. 461, 466 n.5 (2d Cir. 2008) ("Judicial notice may be taken of defendants'

"feature films, TV series, documentaries, advertisements, corporate presentations," and more; they are used by "top brands," including Disney, the BBC, and Discovery Channel. (*Id.* at 2.) Pond5's stock video footage accounts for roughly one third of the media assets it offers to creative professionals: the largest category is photographs (96.6 million) (McPherson Decl. Ex. B), followed by stock video footage (Ex. C (43 million)), then stock illustrations (Ex. D (28.6 million)), sound effects (Ex. E (2.35 million)), music clips (Ex. F (2.29 million)), after effects templates (Ex. G (40,200)) and photoshop templates (Ex. H (9,000)).

Professionals can integrate Pond5's media assets into their projects by paying per item, purchasing a credit pack, or using a monthly or yearly subscription. (*See* Compl. ¶¶ 3, 17, fig. #1.) Pond5 offers subscription plans solely for its music and sound effects, in addition to a subscription plan that includes videos and images. (*Id.* at fig. #1.) Pond5 also offers video clips, images, and music tracks for free. (McPherson Decl. Ex. I.) Many videos can also be viewed without download, purchase, or subscription. Pond5's Commercial Stock Video offers "royalty-free stock footage and videos," including less than 30-second videos that are available in their entirety on the website without log-in, payment, or subscription access. (*See* McPherson Decl. Ex. J (https://www.pond5.com/stock-footage/item/62654249-lawyer-meeting).) For example, a video titled "Lawyer Meeting Video" is labeled for "Commercial Usage," meaning it is "available for advertising, promotional, merchandising, or other commercial uses . . . on any platform including YouTube, social media, film, and TV." (*Id.*) This video is 27 seconds long

---

website for the fact of its publication."); *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006). Moreover, a website is "integral to the complaint" and thus appropriate for consideration where Plaintiff "expressly refer[s]" to it "through the Complaint." *Amable v. New Sch.*, No. 20-CV-3811 (KMK), 2022 WL 1443352, at *9 n.7 (S.D.N.Y. May 6, 2022). Here, Plaintiffs expressly refer to Pond5's website upwards of 14 times in the Complaint. (Compl. ¶¶ 16, 17, 18 n.8, 33, 34, 37 fig. # 2, 39 fig. # 3, 50-52, 56-58, 62.)

and plays on a loop when selected; no log in, registration, or purchase is required to continuously view the video in its entirety. (*Id.*)

### B. Plaintiffs Allege Pond5 Uses Facebook's Tracking Pixel To Transmit Cookies.

Plaintiffs Nixon and Fleming allege that they "purchased pre-recorded videos on Pond5's website" in or about September 2021 and October 2020, respectively. (Compl. ¶¶ 50, 56.) They do not identify any other time in which they purchased or viewed any video content from Pond5.

Plaintiffs allege that starting in February 2018, Pond5 integrated into its website Meta's "Tracking Pixel," which "captures an action" from a user's website activity and "sends a record" of that activity to Meta Platforms Inc. (formerly known as Facebook). (*Id.* ¶¶ 29, 33-47.) Plaintiffs allege that Pond5 collected and transmitted to Meta their or unnamed class members' "c_user," "_fr," and "datr" cookies, and the titles of the videos they viewed when they visited the website. (*Id.* ¶ 34.) According to Plaintiffs, when someone is logged into Facebook and browsing Pond5's website, c_user cookies transmit unencrypted Facebook IDs to Facebook, along with the titles of the video clips they have viewed or downloaded, as revealed by their web page activity. (*Id.* ¶¶ 39-41.) When a browser is logged out of Facebook, the allegedly transmitted material is a "smaller set of cookies," or the "fr_cookie," which contains "an encrypted Facebook ID and browser identifier." (*Id.* ¶¶ 44-46.) Plaintiffs do not allege that they were logged in to Facebook at the time they were allegedly viewing and purchasing videos from Pond5's website. (Although Plaintiffs allege that they each "had an Instagram account since 2011," (Compl. ¶¶ 49, 55), they likewise do not allege that they were logged in to Instagram when they used Pond5's website, nor do they allege how Instagram relates to their allegations regarding Meta Pixel and the alleged disclosure of their Facebook ID or other information.)

### C. Plaintiffs Consented To Pond5 Transmitting Their Cookies To Facebook.

By purchasing videos from Pond5 (*id.* ¶¶ 50, 52 56, 58), Plaintiffs each created an account. At the time they created their account, they each agreed to Pond5's Privacy Policy. (*See* McPherson Decl. Ex. K.) The page to create an account informed Plaintiffs that "[b]y creating an account, you accept our Privacy Policy and Terms of Service," and included a hyperlink to each of those policies (*Id.*)

The Privacy Policy in effect as of October 2020, the time of Plaintiffs' earliest alleged purchase, makes clear that "[b]y accessing or using our Website, you consent to our collection, use, processing and sharing of your personal information/data in accordance with this policy." (McPherson Decl. Ex. L at 1.) The Privacy Policy describes Pond5's "collection, use, processing and sharing of [the user's] personal information and [Pond5's] use of cookies," as well as a user's "choices . . . regarding [Pond5's] use of [their] personal information and how [they] can access and update this information." (*Id.*) Under the heading "Collection of Personal Information," the Privacy Policy explains that "[m]ost web browsers automatically accept cookies but provide controls that allow you to block or delete them," and further explains that each browser provides "[i]nstructions for blocking or deleting cookes." (*Id.*)

Pond5's Privacy Policy contains a specific section devoted to "Pixels," the technology Plaintiffs complain about:

> The Website contains Pond5 and third party advertisement service provider tracking pixels. A tracking pixel is an HTML code snippet which is loaded when a user visits a website or opens an email. These pixels are used to track user behavior and enable us to associate responses to our emails and digital advertisements placed by us or such service providers on third party websites with you and your Website account and/or compile aggregated statistics to analyze the effectiveness of our digital advertisement campaigns. These third parties include Facebook . . . . To learn more about their treatment of your personal information and the options they make available for managing such treatment, . . . see https://www.facebook.com/about/privacy [and] https://www.facebook.com/settings

(*Id.* at 2.)[2]

In short, Plaintiffs' alleged purchases from Pond5 required the creation of an account, which in turn required acceptance of the Privacy Policy, which in turn informed Plaintiffs that Pond5 has installed Meta Pixel (formerly Facebook), and that unless they opt out, Pond5 will collect and use information from their web activity and cookies, along with certain personal information. Plaintiffs do not allege they opted out of Pond5's use of cookies.

## II. ARGUMENT

### A. The Complaint Should Be Dismissed Under Fed. R. Civ. P. 12(b)(1) For Lack Of Standing.

A court must dismiss a complaint under Federal Rule of Civil Procedure 12(b)(1), if a plaintiff does not satisfy Article III's standing requirements. *Brokamp v. James*, 66 F.4th 374, 386 (2d Cir. 2023).

"[T]o establish standing, a plaintiff must show [] that he suffered an injury in fact that is concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). In the context of statutory claims, such as Plaintiffs' only claim here, there is no Article III standing absent "plaintiff's suffering [of] concrete harm" as a result of "defendant's violation of" the statute. *Id.* at 425-26. "[U]nder Article III, an injury in law is not an injury in fact." *Id.* at 427. "[C]oncrete injuries" most obviously include "physical harms and monetary harms," but also include "injuries with a close relationship to harms traditionally recognized as

[2] Pond5 has maintained the same disclosure in its current iteration of the Privacy Policy, effective as of February 28, 2023. The only difference is that Pond5 added LinkedIn as an additional third-party service provider. (McPherson Decl. Ex. M at 3.) This addition further underscores that Pond5 is a website used by professional creatives and that the videos purchased from Pond5 are not for private viewing, but incorporated into works for a public audience.

providing a basis for lawsuits in American courts," such as "disclosure of private information." *Id*. at 425.

No such concrete harm exists here. Plaintiffs' theory of injury rests on Pond5's alleged disclosure of Plaintiffs' "personally identifiable information" in violation of 18 U.S.C. § 2710. (Compl. ¶ 81.) And indeed, some courts—including this one—have found that plaintiffs have Article III standing to assert a claim for violation of the VPPA. *Salazar v. Nat'l Basketball Ass'n*, 685 F. Supp. 3d 232, 241 (S.D.N.Y. 2023) (Rochon, J.) (analogizing to "[i]ntrusion upon seclusion," comparable to "intrusion into someone's privacy 'by opening [a plaintiff's] private and personal mail'" (citation omitted, second alteration in the original)). But those courts' conclusions rested on completely different allegations. Those courts considered claims by plaintiffs alleging that videos they viewed privately were disclosed without their authorization. *See, e.g., id.* at 236 (finding standing based on "personal viewing" of NBA videos); *Carter v. Scripps Networks, LLC*, 670 F. Supp. 3d 90, 95-96 (S.D.N.Y. 2023) (finding plaintiffs had standing where their personal information and viewing activities of home, lifestyle, and home improvement videos from HGTV were disclosed).

Plaintiffs here cannot allege anything like that. The "consumers" that the VPPA is intended to protect are individuals who view videos in private, with the expectation that what they view will remain private. (*See* Compl. ¶ 14.) As alleged, Pond5 does not serve such an individual. Pond5 markets "stock video[s]" (*id.* ¶ 16) to professionals like Plaintiffs and other "filmmakers, media organizations, and marketers worldwide." (McPherson Decl. Ex A at 1.) These content creators are not viewing stock videos for private consumption; they are viewing such content for the express purpose of using and repurposing that content for public use. (*See* McPherson Decl. Ex. N at 1 ("Tell us about your project and our team will curate the very best

content from our vast catalogue . . . to help you tell stories, share knowledge, and inspire audiences.”).) To that end, Pond5’s subscribers obtain commercial licenses to use stock video and video templates to create videos for further public display. (*See* McPherson Decl. Ex. O at 2 (“Our media licensing experts will provide a curated recommendation on the right license for your project.”).)

Far from VPPA’s effort to protect “*private video viewing habits*,” *Osheske v. Silver Cinemas Acquisition Co.*, 700 F. Supp. 3d 921, 927 (C.D. Cal. 2023) (emphasis in original) (finding that the VPPA does not apply to films viewed in a public movie theater), *appeal docketed* No. 23-3882 (9th Cir. Nov. 30, 2023), then, Plaintiffs’ VPPA claim here does not bear “a close relationship” to traditional privacy harms. Plaintiffs thus cannot frame their Amended Complaint as one grounded on “disclosure of private information” or “intrusion upon seclusion,” the kinds of “historical or common-law analogue[s]” *TransUnion* identified as sufficient to confer standing from some limited kinds of statutory violations. 594 U.S. at 424-25. As courts since *TransUnion* have explained, in the context of informational privacy, only the “dissemination or misuse of sensitive and confidential information” is protected. *In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1041 (N.D. Cal. 2014); *see also Barclift v. Keystone Credit Servs., LLC*, 585 F. Supp. 3d 748, 759 (E.D. Pa. 2022) (“Barclift has not alleged that she suffered a concrete injury because her private information was never publicized.”). There is nothing “sensitive” or “confidential” about content that third-party creators intend to share with the public. *See McCarthy v. Barrett*, 804 F. Supp. 2d 1126, 1145 (W.D. Wash. 2011) (explaining in the context of a state constitutional surveillance claim that “Plaintiffs had no privacy interest in any information that they voluntarily posted on public websites”); *United States v. Meregildo*, 883 F. Supp. 2d 523, 525 (S.D.N.Y. 2012) (explaining in the context of a motion to suppress

evidence that there is no Fourth Amendment privacy right "[w]hen a social media user disseminates his postings and information to the public[;] they are not protected by the Fourth Amendment").

And as the Supreme Court demonstrated in *TransUnion*, standing cannot be determined based on a statute writ large; it must be determined based on the particular claims brought by particular plaintiffs. 594 U.S. at 426. In that case, for example, some members of the plaintiff class—those who could point to an invasion of their privacy interests—had standing to assert claims under the Fair Credit Reporting Act, while other members of the class—those who could not point to any such privacy interests—did not. *Id.* at 433. So too here, while some plaintiffs may have standing to bring a VPPA claim against other defendants in other contexts, these Plaintiffs do not, because they cannot point to any privacy interests at stake.

None of the other VPPA cases suggests otherwise. No court has found that a plaintiff has standing to state a claim under the VPPA based on the activity that they undertake for work to create publicly consumed media or websites. Nor should this Court: the circumstances here are well outside the scope of the VPPA's protection for private, at-home viewing, and require this case to be dismissed.

### B. The Complaint Should Be Dismissed Under Fed. R. Civ. P. 12(b)(6) For Failure To State A Claim.

To overcome a Rule 12(b)(6) motion to dismiss after *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), Plaintiffs' factual allegations must allege "more than a sheer possibility that a [party] has acted unlawfully" and more than "facts that are 'merely consistent with' a [party's] liability." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

On a motion to dismiss, courts must construe the complaint in the light most favorable to the plaintiff and "take all the factual allegations in the complaint as true." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). But courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.*; *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009) (same).

"[I]n order to plead a plausible claim under section 2710(b)(1), a plaintiff must allege that (1) a defendant is a video tape service provider, (2) the defendant disclosed '[PII] concerning any customer' to 'any person,' (3) the disclosure was made knowingly, and (4) the disclosure was not authorized by section 2710(b)(2)." *Martin v. Meredith Corp.*, No. 22-cv-04776 (DLC), 657 F. Supp. 3d, 277, 284 (S.D.N.Y. 2023) (quoting *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015)). Not only do Plaintiffs fail to plead these elements here, their pleading also demonstrates that any claim they might have brought under the VPPA is time-barred.

**1. Plaintiffs' Only Alleged Claim Is Time-Barred.**

"A motion to dismiss on statute of limitations grounds generally is treated as a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6)[.]" *Nghiem v. U.S. Dep't of Veterans Affairs*, 451 F. Supp. 2d 599, 602–03 (S.D.N.Y. 2006), *aff'd*, 323 F. Appx. 16 (2d Cir. 2009). A defendant may raise a statute of limitations defense, which is considered an affirmative defense, at the motion to dismiss stage, without conversion to a motion for summary judgment, where the "plaintiff's own allegations show that the defense exists." *Id.* at 603 (internal quotation marks omitted). "Because the statute of limitations is an affirmative defense, the defendant bears the burden of establishing by prima facie proof that the limitations period has expired since the plaintiff's claims accrued. . . . The burden then shifts to the plaintiff to establish that the limitations period should be tolled." *HV Assocs. v. PNC Bank, N.A.*, No. 19-

cv-07438 (ALC), 2020 WL 5819559, at *5 (S.D.N.Y. Sept. 30, 2020) (quoting *Overall v. Estate of Klotz*, 52 F.3d 398, 403 (2d Cir. 1995)).

Plaintiffs' asserted VPPA claim here should be dismissed as time-barred. A claim under the VPPA must be brought "within 2 years from the date of the act complained of or the date of discovery." 18 U.S.C. § 2710(c)(3); *see also Daniel v. Cantrell*, 375 F.3d 377, 380 (6th Cir. 2004) (affirming dismissal based on the statute of limitations, among other grounds). Taking the Complaint's allegations as true, Plaintiffs allege that "Nixon purchased pre-recorded videos on Pond5's website" in or about September 2021, and Fleming did so in or about October 2020. (Compl. ¶¶ 50, 56.) Plaintiffs do not allege any other purchases. And the date of purchase is the key for determining when Plaintiffs' VPPA claim accrues, because as alleged in the Complaint, it is at the moment of downloading a video that Pond5's website allegedly uses the Meta Pixel to disclose the video download to Meta. (*Id.* ¶¶ 39-40.) (While the Complaint also alleges that the Meta Pixel discloses information upon viewing a video (*id*. ¶¶ 36-38), Plaintiffs do not allege that they viewed any videos after 2021.) Yet Plaintiffs filed the Complaint on July 31, 2024, (ECF No. 1), almost a year too late for Nixon and more than a year and a half too late for Fleming.

Plaintiffs cannot resuscitate their claim by relying on the fraudulent concealment doctrine or delayed discovery doctrine to toll the statute of limitations. (*Id.* ¶ 61.) "A plaintiff seeking to toll the applicable statute of limitations due to fraudulent concealment . . . must meet the particularity standard of Rule 9(b)." *In re Nat. Gas Commodity Litig.*, 337 F. Supp. 2d 498, 513-14 (S.D.N.Y. 2004). "To comply with Rule 9(b)'s heightened pleading standard in the context of alleging fraudulent concealment, 'a complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the

statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.'" *Kyszenia v. Ricoh USA, Inc.*, 583 F. Supp. 3d 350, 361 (E.D.N.Y. 2022) (quoting *Milo v. Galante*, No. 09-CV-1389 (JBA), 2011 WL 1214769, at *5 (D. Conn. Mar. 28, 2011); *see also De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 319 (S.D.N.Y. 2013) ("Generalized or conclusory allegations of fraudulent concealment are not sufficient to toll a statute of limitations."). Plaintiffs cannot meet that standard merely by claiming that they did not discover the "surreptitious[]" collection and transmission of their information until July 2024. (Compl. ¶¶ 53, 59.) *See Sejin Precision Indus. Co. v. Citibank, N.A.*, 235 F. Supp. 3d 542, 552 (S.D.N.Y. 2016) (finding "plaintiffs' general allegation that defendants 'engaged in secret and surreptitious activities' in order to conceal their misconduct" insufficient to establish fraudulent concealment for purposes of tolling).

Indeed, the Complaint itself undermines Plaintiffs' allegation that the Meta Pixel and other unnamed "tracking tools" on Pond5's website "were and remain entirely invisible to a website visitor." (Compl. ¶ 62.) Plaintiffs allege that Meta Pixel transmits information from Pond5's website, including the title of the video that a user views (the "Page View") and includes in the Complaint an image of the purported Page View event with URL code allegedly derived from Pond5's website. (*Id.* ¶¶ 37-38, fig. #2.) Figure #2 in the Complaint shows a "Meta Pixel Helper" that states a pixel was "found on www.pond5.com," and that the "Pixel Location" is "https://www.pond5.com/stock-footage/item/99101-soldeirs-marching." (*Id.*) Similarly, the Complaint describes the transmission through Meta Pixel of a "Purchase Event," based on "[w]hen a . . . customer purchase[s] and download[s] a prerecorded video," that also includes an image that shows Pond5's URL code. (*Id.* ¶¶ 39-40, fig. #3.) Nothing in Figures 2 and 3 of the

Complaint is a revelation; Plaintiffs offer no reason why they could not have viewed similar diagrams from their web browser until recently.

Likewise, Pond5's Privacy Policy undermines Plaintiffs' insistence that they were "ignorant of the information essential to pursue their claims" because Pond5's "Privacy Policy does not inform . . . customers that their Personal Identifiable Information will be disclosed to unauthorized third parties such as Meta" (*id.* ¶¶ 63-64).[3] In no uncertain terms, the Privacy Policy states that Pond5's website "contains Pond5 and third party advertisement service provider tracking pixels," including Facebook (now Meta). (McPherson Decl., Ex. L at 2.) The Privacy Policy continues to explain to that a "tracking pixel is an HTML code snippet which is loaded when a user visits a website or opens an email," and is "used to track user behavior." (*Id.*) The Privacy Policy further states that users can "learn more about [Facebook's] treatment of your personal information and the options they make available for managing such treatment." (*Id.*) Plaintiffs could hardly be "deceived" by Pond5's use of the Meta Pixel (Compl. ¶ 63); Pond5 required that each purchaser, including Plaintiffs, agree to the very terms that disclose Pond5's use of Meta Pixel. (*See* McPherson Decl. Exs. K at 1, L at 2.)

Nor is there anything to Plaintiffs' allegation that "[e]ach unauthorized transmission of Plaintiffs' and Class Members' Personally Identifiable Information . . . triggers anew" the two-year period (Compl. ¶ 60), because they only allege a single instance each of purchasing videos well outside of the statute of limitations (*id.* ¶¶ 50, 56.). The Complaint alleges that the Meta Tracking Pixel "transmits information associated with two distinct events": "PageView" and

[3] On a motion to dismiss, "district courts may review . . . documents appended to the complaint or incorporated in the complaint by reference." *Clark v. Hanley*, 89 F.4th 78, 93 (2d Cir. 2023) "Where a document is referenced in a complaint, the documents control and [the court] need not accept as true the allegations in the . . . complaint." *Tongue v. Sanofi*, 816 F.3d 199, 206 n.6 (2d Cir. 2016) (quotation marks and citation omitted).

"Purchase." (*Id.* ¶ 36.) According to Plaintiffs, the transmission of information is contemporaneous with the "purchase and download [of] a prerecorded video." (*Id.* ¶ 39.) Because the only contemporaneous transmission would have occurred at the time of purchase (again, Plaintiffs allege no viewing activity aside from their purchases), and because the purchases Plaintiffs allege are beyond the time period, they do not allege that Pond5 has violated the VPPA within two years before the filing of the Complaint.

**2. Pond5 Is Not A Video Tape Service Provider Under The VPPA.**

Pond5, a design resources website for professional creators, does not satisfy the definition of a video tape service provider under the VPPA. A "'video tape service provider' means any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). For Pond5 to be "engaged in the business" of selling audio-visual materials, Plaintiffs must "sufficiently plead the defendant's involvement 'connotes a particular field of endeavor' or a 'focus of the defendant's work.'" *Cantu v. Tapestry, Inc.*, 697 F. Supp. 3d 989, 993 (S.D. Cal. 2023) (quoting *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017)). By requiring a video tape service provider to be "engaged in the business . . . of . . . rental, sale, or delivery" of video content, the text of the statute demands more than just a mere sale of video content. *See In re Vizio*, 238 F. Supp. 3d. at 1221 (relying on several dictionary definitions of "business" to construe the statutory definition). "[T]o be engaged in the business of delivering video content, the defendant's product must not only be *substantially* involved in the conveyance of video content to consumers but also *significantly* tailored to serve that purpose." *Id.* (emphasis added) (finding that a Smart TV seller was a video tape service provider where it relied on the profits of consumer data sales as an integral part of its business model); *see also* S. Rep. No. 100-599, at 12 (1988) (the definition of PII "includes the

term 'video' to make clear that simply because a business is engaged in the sale or rental of video materials or services [*sic*] does not mean that all of its products or services are within the scope of the bill.").

Plaintiffs cannot allege that Pond5 satisfies these requirements. Plaintiffs allege that Pond5 "operates a stock video service by which its users can purchase and download pre-recorded videos." (Compl. ¶ 16.) Pond5's website does, indeed, include stock videos. But this is only a portion of what Pond5 offers. As is clear from Pond5's website, which the Complaint cites more than one dozen times, Pond5 offers designers many kinds of creative assets. In fact, Pond5's stock videos and video templates represent only two of fourteen categories of assets, and only about a third of the individual assets available. (*See supra* Section I.A.) And professionals could pay for creative assets on Pond5 without ever downloading a single video, including by using its music-only subscription.

If delivering video content is not necessary to the Pond5 experience, Pond5 is hardly "significantly tailored" to delivering video content. *In re Vizio*, 238 F. Supp. 3d. at 1221. At most, Pond5 is only "peripherally or passively involved in video content delivery," which is not sufficient to "fall within the statutory definition of video tape service provider." *Id.* at 1221-22; *see also Carroll v. Gen. Mills, Inc.*, No. 23-cv-1746-DSF-MRWx, 2023 WL 4361093, at *4 (C.D. Cal. June 26, 2023) (defendant was not a "video tape service provider" because "[n]othing suggest[ed] that Defendant's business [was] centered, tailored, or focused around providing and delivering audiovisual content"); *Cantu v. Tapestry, Inc.*, No. 22-cv-1974-BAS-DDL, 2023 WL 4440662, at *8 (S.D. Cal. July 10, 2023) (allegation that defendant's "business model involves monetizing instances in which consumers watch videos" was insufficient because it failed to

plausibly suggest that defendant's enterprise was "'significantly tailored' to achieving that purchase").

Any cases Plaintiffs may cite to the contrary applied the VPPA to consumer-facing companies whose business predominantly included providing videos to consumers for information or entertainment purposes. For example, in *Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 156-57 (S.D.N.Y. 2023), the complaint included allegations not present here that "on-demand, pre-recorded audio-visual materials" available on the website Today.com were "part of Today.com's business model," as the website "sells users' video-viewing information to advertisers." And in *Sellers v. Bleacher Rep., Inc.*, No. 23-cv-00368-SI, 2023 WL 4850180, at *6 (N.D. Cal. July 28, 2023), the court also denied a motion to dismiss as premature based on "factual questions about the degree to which Bleacher Report's business model is tailored to delivery of audio visual materials." There, defendant argued that the VPPA should not apply because it is a news organization without addressing the quantity of video content relative to other offerings, as Pond5 does here. Finally, in *Aldana v. GameStop, Inc.*, No. 22-CV-7063-LTS, 2024 WL 708589, at *6 (S.D.N.Y. Feb. 21, 2024), *motion to certify appeal denied*, No. 22-CV-7063-LTS-VF, 2024 WL 3104345 (S.D.N.Y. June 24, 2024), the court concluded that video clips in the form of "cut scenes" were included in the video games that GameStop sold. By contrast, not all of Pond5's products include a video component. And none of those cases considered the key difference here: Pond5 is a B2B business whose customers are themselves professionals who license stock content to re-produce that content for different end-users.

In the absence of an authoritative holding on just how much video content a plaintiff is required to plead to turn a defendant into a video tape service provider and survive a motion to dismiss, the Court should decline to follow these cases. Pond5 is different from Today.com,

Bleacher Report, and GameStop in obvious ways: while those companies feature substantial video content central to their website's or product's purposes of informing or entertaining consumers, Pond5's stock videos are limited—both in relative quantity compared to other offerings and in the purpose for which it offers them.

**3. Plaintiffs Do Not Allege Disclosure Of PII.**

Even taking the Amended Complaint's allegations as true, Plaintiffs can do no more than speculate that their PII has been disclosed. Indeed, the Amended Complaint is so carefully drafted that Plaintiffs do not even allege that their PII was, in fact, disclosed. Plaintiffs plead only that *either* their *or* a class members' PII was disclosed. (Compl. ¶ 34.) Of course, before class certification, it is only the allegations related to Plaintiffs Nixon and Fleming—not any of the purported class members—that matter for purposes of surviving a motion to dismiss. *See In re Bibox Grp. Holdings Ltd. Sec. Litig.*, 534 F. Supp. 3d 326, 334 (S.D.N.Y. 2021) ("[C]ourts typically address only the . . . claims of the named plaintiff at the motion to dismiss stage.").

Considering only allegations applicable to Plaintiffs themselves, Plaintiffs cannot adequately allege any disclosure of their PII. "While the Second Circuit has not further defined PII" for purposes of the VPPA, two approaches have emerged in other circuits. *See Solomon v. Flipps Media, Inc.*, No. 22-cv-5508 (JMA)(JMW), 2023 WL 6390055, at *2 (E.D.N.Y. Sept. 30, 2023), *appeal docketed*, No. 23-7597 (2d Cir. Nov. 1, 2023); *Wilson v. Triller, Inc.*, 598 F. Supp. 3d 82, 90–91 (S.D.N.Y. 2022). "[T]he First Circuit [has] held that PII encompasses 'information reasonably and foreseeably likely to reveal which . . . videos [a person] has obtained' to the third party to whom the information is disclosed." *Wilson*, 598 F. Supp. 3d at 91 (citing *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016)). And the Third and Ninth Circuits have held that to state a claim under the VPPA, a plaintiff must allege the disclosure of "information that readily permits an ordinary person to identify a particular

individual as having watched certain videos." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 984-85 (9th Cir. 2017); *In re Nickelodeon*, 827 F.3d 262, 282-83 (3d Cir. 2016).

Courts in this district have followed the Third and Ninth Circuits' narrower approach. *See Wilson*, 598 F. Supp. 3d at 91; *Solomon*, 2023 WL 6390055, at *2. This "ordinary person" standard mirrors the purpose of the VPPA, which "focuses on what information a video service provider knowingly discloses" as opposed to "what the recipient of that information decides to do with it." *Eichenberger*, 876 F.3d at 985. As such, a numeric identifier alone, even when coupled with the names of videos that a plaintiff watched, does not constitute PII, as an ordinary person would not be able to readily use such information to identify an individual. *Id.* at 986.

Plaintiffs cannot satisfy either standard here. That is because they do not allege the transmission of anything other than an encrypted Facebook ID to Meta. Recall that Plaintiffs do not allege that they were logged in to Facebook at the time they purportedly viewed and downloaded videos. (*See supra* Section I.B.; Compl. ¶¶ 48-59.) Plaintiffs acknowledge that if a browser is logged out of Facebook, the transmitted cookies contain an encrypted Facebook ID. (Compl. ¶¶ 44-46.) Plaintiffs even copy the random string of characters for the encrypted Facebook ID without redaction, unlike the Facebook ID allegedly transmitted in c_user cookies. (*Compare id.* ¶ 44, fig. #5 *with id.* ¶ 41, fig. #4.) Plaintiffs thus tacitly admit that where only an encrypted Facebook ID is disclosed, an ordinary person could not "identify a particular individual as having watched certain videos," and no PII was disclosed for purposes of the VPPA. *Eichenberger*, 876 F.3d at 985 (cleaned up).

Because the Facebook IDs allegedly disclosed here were encrypted, cases that have held that Facebook IDs are PII are distinguishable. *See, e.g.*, *Collins v. Pearson Educ., Inc.*, No. 23 CIV. 2219 (PAE), 2024 WL 895316, at *8 (S.D.N.Y. Mar. 1, 2024) (collecting cases where "the

Facebook ID was transmitted through a[n unencrypted] c_user cookie"); *Salazar*, 685 F. Supp. 3d at 237 ("Plaintiff has watched videos 'through NBA.com and/or the App' while logged into his Facebook account.").

And even if Plaintiffs could allege that their *un*encrypted Facebook IDs were disclosed, Plaintiffs do not allege that their Facebook pages contain any personal information, such as their names or email addresses. In the absence of such allegations, "the complaint does not adequately allege that [disclosure of Plaintiffs' Facebook IDs] result[s] in the sharing of any personal information." *Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 720 (N.D. Cal. 2023); *Solomon*, 2023 WL 6390055, at *3 ("Plaintiff needed to allege that her public Facebook profile page contained identifying information about her in order to state a plausible claim."). Nor do Plaintiffs allege how "an ordinary person" could identify their video viewing behavior based on information transmitted to Facebook. (Compl. ¶ 43.)

**4. Plaintiffs Consented To Pond5's Recording And Use Of Information.**

Alternatively, assuming Plaintiffs could adequately allege the disclosure of PII—they do not—the Amended Complaint should be dismissed because Plaintiffs consented to Pond5's use of the Meta Pixel and its alleged disclosure of PII.

The VPPA allows a video tape service provider to disclose PII of a consumer with the consumer's "informed, written consent." 18 U.S.C. § 2710(b)(2)(B). Pond5's website satisfies the VPPA's requirements: it obtains consent (1) "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," (2) "at the time disclosure is sought" or "given in advance for a set period of time not to exceed two years," and (3) it provides the consumer with the ability to opt out from disclosures "in a clear and conspicuous manner." *Id.*

**(a) Pond5 users consent to the Privacy Policy when they create an account.**

Plaintiffs allege that they purchased videos from Pond5 (Compl. ¶¶ 50, 56), requiring them to create a user account. By creating an account, Plaintiffs agreed to the Pond5 Privacy Policy. Where a user can enter an email and password to create an account, the archived web page states, "By creating an account, you accept our Privacy Policy and Terms of Service." (McPherson Decl., Ex. K.) Above that text appears a large "Join" button. Thus, a user cannot create an account—a requirement to purchase Pond5 video content—without agreeing to the Privacy Policy. (*See supra* Section I.B.)

Courts uphold agreements as valid and enforceable across a wide range of contexts where, as here, the user is required to affirmatively acknowledge the agreement before proceeding with use of the website. *See, e.g.*, *Brooks v. WarnerMedia Direct, LLC*, No. 23 CIV. 11030 (KPF), 2024 WL 3330305, at *14 (S.D.N.Y. July 8, 2024) ("A user's click of a button can be construed as an unambiguous manifestation of assent ... [where] the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement" to an arbitration provision); *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 835, 838–40 (S.D.N.Y. 2012) (enforcing forum selection clause in website's terms of service where a notice below the "Sign Up" button stated, "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service," and user had clicked "Sign Up").

Pond5's Privacy Policy is separate and distinct from the User Terms. 18 U.S.C. § 2710(b)(2)(B). They are accessed by different hyperlinks, and different pages within Pond5's website. (*See* McPherson Decl., Exs. L, P.) There are no other legal or financial obligations of Pond5's customers or website visitors set forth in the Privacy Policy. (*See* McPherson Decl., Ex. L.) As such, the Privacy Policy satisfies the VPPA's requirements of the form of consent.

**(b) The Privacy Policy specifically addresses the alleged disclosures.**

Pond5's Privacy Policy—to which users must agree in order to create a Pond5 account—notifies purchasers like Plaintiffs that Pond5 shares personal information with third parties. The Privacy Policy outlines the type of personal information that Pond5 collects, how it is collected, and how Pond5 uses personal information. (*See* McPherson Decl. Ex. L.)

As described above, at the time that Plaintiffs made their respective purchases and continuing through present day, the Privacy Policy explains that Pond5 uses "identifiers, cookies, and other tracking technologies and electronic network activity, financial and commercial information to . . . provide [users] information and advertisements that [Pond5] believe[s] are relevant to your interests." (*Id.* at 3; Ex. M. at 4) The Privacy Policy specifically declares that Pond5's website "contains . . . tracking pixels" that "are used to track user behavior," and disclosed to "third parties" such as "Facebook." (Ex. L at 2.) The Privacy Policy further directs users to "learn about [Facebook's] treatment of [users'] personal information and the options they make available for managing such treatment," directing to a specific settings page and privacy information page on Facebook's website. (*Id.*)

Thus, the Privacy Policy—to which Plaintiffs consented when they created their respective accounts—discloses that Plaintiffs' usage data may be tracked, discloses that such data might be used for purposes including advertising, discloses that such data could be disclosed to Facebook specifically, and provides information on how to disable the technology. The Complaint omits any allegation that Plaintiffs never gave Facebook consent to install the c-user cookies and collect Plaintiffs' browsing information. Because Plaintiffs chose not to opt out of Pond5's use of Meta's tracking pixel, they necessarily consented to the pixel's disclosure of any PII. As such, Plaintiffs cannot state a claim under the VPPA, which only prohibits unauthorized disclosure of information. 18 U.S.C. § 2710(b)(2)(B).

## CONCLUSION

For all of these reasons, Pond5 respectfully requests that the Court dismiss the Complaint in its entirety, with prejudice.

Dated: September 20, 2024
New York, New York

**GOODWIN PROCTER LLP**

By: /s/ _*Mark David McPherson*
Mark David McPherson
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel. (212) 813-8800
Fax (212) 355-3333
mmcpherson@goodwinlaw.com

W. Kyle Tayman (admitted pro hac vice)
901 New York Avenue NW
Washington, DC 20001
Tel. (202) 346-4000
Fax (202) 346-4444

*Attorneys for Defendant Pond5, Inc.*

**CERTIFICATION OF WORD COUNT**

I hereby certify that this brief contains 8,128 words and complies with the Court's Individual Rule 3.C.

s/ _*Mark David McPherson*
Mark David McPherson
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel. (212) 813-8800
Fax (212) 355-3333
mmcpherson@goodwinlaw.com