**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF NEW YORK**

**MATTHEW NIXON** and **PETER FLEMING**, *on behalf of themselves and all others similarly situated,*

*Plaintiffs,*

v.

**POND5, INC.**,

*Defendant.*

**Case No. 24-cv-05823 (JLR)**

**Judge**: HON. JENNIFER L. ROCHON

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS CLASS ACTION COMPLAINT**

HAMMONDLAW, P.C.
1201 Pacific Ave, Suite 600
Tacoma, WA 98402
(310) 601-6766 (Office)
(310) 295-2385 (Fax)

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

I. INTRODUCTION ........ 1

II. SUMMARY OF ALLEGATIONS FROM PLAINTIFFS' COMPLAINT ........ 1

III. ARGUMENT ........ 2

A. PLAINTIFFS HAVE STANDING TO PURSUE THEIR CLAIMS ........ 2

B. PLAINTIFFS HAVE MET THE 12(B)(6) REQUIREMENTS FOR ALLEGING THEIR VPPA CLAIM ........ 8

1. Applicable Legal Standard ........ 8

2. Plaintiffs' VPPA Claim is Not Time-Barred ........ 9

3. Pond5 is a Video Tape Service Provider Under the VPPA ........ 11

4. Plaintiffs Adequately Allege Disclosure of Personally Identifiable Information ........ 15

5. Plaintiffs Did Not Consent to Pond5's Disclosure of their Personally Identifiable Information ........ 18

C. LEAVE TO AMEND ........ 20

IV. CONCLUSION ........ 21

## TABLE OF AUTHORITIES

### CASES

*Addi v. Intl. Bus. Machines, Inc.*, No. 23 CIV. 5203, 2024 WL 2802863 (S.D.N.Y. May 31, 2024) .......... 3

*Ade v. Viki, Inc.*, No. 23-cv-02161, 2024 WL 1880153 (N.D. Cal. Mar. 28, 2024).......... 18

*Alex v. NFL Enterprises LLC*, No. 22-CV-09239, 2023 WL 6294260 (S.D.N.Y. Sept. 27, 2023) 3

*Austin-Spearman v. AMC Network Entm't LLC*, 98 F. Supp. 3d 662 (S.D.N.Y. 2015) .......... 3

*Barclift v. Keystone Credit Servs. LLC*, 585 F. Supp. 3d 748 (E.D. Pa. 2022) .......... 6

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......... 8

*Belozerov v. Gannett Co.*, 646 F.Supp.3d 310 (D. Mass. 2022).......... 16

*Cantu v. Sunrun Inc.*, No. 23-cv-974, 2023 WL 11795670 (S.D. Cal. Nov. 22, 2023).......... 13

*Cantu v. Tapestry, Inc.*, No. 22-cv-1974, 2023 WL 4440662 (S.D. Cal. July 10, 2023) 4, 8, 12, 13

*Carroll v. General Mills, Inc.*, No. 23-cv-1746, 2023 WL 4361093 (C.D. Cal. June 26, 2023).. 14

*Carter v. HealthPort Techs., LLC*, 822 F.3d 47 (2d Cir. 2016).......... 2

*Carter v. Scripps Networks, LLC*, 670 F. Supp. 3d 90 (S.D.N.Y. Apr. 24, 2023).......... 3, 4

*Collins v. Pearson Educ., Inc.,* No. 23 CIV. 2219, 2024 WL 895316 (S.D.N.Y. Mar. 1, 2024) ... 3

*Czarnionka v. Epoch Times Association, Inc.*, No. 22 Civ. 6348, 2022 WL 17069810 (S.D.N.Y., Nov. 17, 2022) .......... 16

*Eichenberger v. ESPN*, 876 F.3d 979 (9th Cir. 2017) .......... 4, 15

*Ellis v. Cartoon Network, Inc.*, No. 14 Civ. 484, 2014 WL 5023535 (N.D. Ga. Oct. 8, 2014), *aff'd on other grounds*, 803 F.3d 1251 (11th Cir. 2015).......... 17

*Fan v. NBA Properties Inc.*, No. 23-cv-05069-SI, 2024 WL 1297643 (N.D. Cal. Mar. 26, 2024) .......... 18

*Foman v. Davis*, 371 U.S. 178 (1962) .......... 21

*Golden v. NBC Universal Media, LLC*, 688 F. Supp. 3d 150 (S.D.N.Y. 2023).......... 15, 17

*Harris v. Pub. Broad. Serv.*, 662 F.Supp.3d 1327 (N.D. Ga. 2023).......... 16

*In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262 (2016) .......... 15

*In re Vizio, Inc. v. Consumer Privacy Litig.,* 238 F. Supp. 3d 1204 (C.D. Cal. 2017) ................. 12

*In re Yahoo Mail Litig.,* 7 F. Supp. 3d 1016 (N.D. Cal. 2014) ..................................................... 5

*Jackson v. Fandom, Inc.*, No. 22-CV-04423, 2023 WL 4670285 (N.D. Cal. July 20, 2023) ...... 16

*Lebakken v. WebMD, LLC*, 640 F. Supp. 3d 1335 (N.D. Ga. 2022) .......................................... 16

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F. 3d 160 (2d Cir. 2015)........... 21

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................................. 2

*Martin v. Meredith Corp.*, 657 F. Supp. 3d 277, 283 (S.D.N.Y. 2023), *appeal withdrawn*, No. 23-412, 2023 WL 4013900 (2d Cir. May 24, 2023) ........................................................................ 3

*Osheke v. Silver Cinemas Acquisition Co.,* 700 F. Supp. 3d 921 (C.D. Cal. 2023)........................ 5

*Pileggi v. Washington Newspaper Publ'g Co., LLC,* No. CV 23-345, 2024 WL 324121 (D.D.C. Jan. 29, 2024)........................................................................................................................ 4

*Sacerdote v. New York U.*, 9 F. 4th 95 (2d Cir. 2021) .................................................................. 21

*Salazar v. Nat'l Basketball Ass'n*, 685 F. Supp. 3d 232 (S.D.N.Y. 2023) ..................................... 3

*Salazar v. Nat'l Basketball Ass'n.*, 118 F.4th 522, 537 (2d Cir. Oct. 15, 2024)............. 3, 6, 11, 12

*Sellers v. Bleacher Rep., Inc.*, No. 23-CV-00368, 2023 WL 4850180 (N.D. Cal. July 28, 2023) 16

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) .................................................................................. 2

*Tawam v. Feld Entertainment Inc.*, 684 F.Supp.3d 1056 (S.D. Cal. July 28, 2023) .................... 12

*TransUnion LLC v. Ramirez,* 594 U.S. 413, 427 (2021) .................................................. 2, 3, 5, 6

*Williston Basin Interstate Pipeline Co. v. An Exclusive Gas Storage Leasehold & Easement in the Cloverly Subterranean Geological Formation*, 524 F.3d 1090 (9th Cir. 2008) ................... 8

*Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F. 3d 482 (1st Cir. 2016) .......................... 15

**STATUTES**

18 U.S.C. § 2710(a)(3)........................................................................................................... 1, 15

18 U.S.C. § 2710(a)(4)........................................................................................................... 1, 11

18 U.S.C. § 2710(b)(1) ................................................................................................................. 1

18 U.S.C. § 2710(b)(2) ............................................................................................................... 18

18 U.S.C. § 2710(b)(2)(B)(i)-(iii) ................................................................................................ 18

18 U.S.C. § 2710(b)(2)(B)(ii) ..... 20
18 U.S.C. § 2710(b)(2)(B)(iii) ..... 20
18 U.S.C. §§ 2710 *et seq* ..... 1, 9
Fed. R. Civ. P. 12(b)(1) ..... 21
Fed. R. Civ. P. 12(b)(6) ..... 5, 8, 20, 21
Fed. R. Civ. P. 15(a)(2) ..... 21

## I. INTRODUCTION

Defendant Pond5, Inc. ("Defendant" or "Pond5") operates a service through which its customers have the option to either purchase individual pre-recorded stock videos or pay for a subscription service. Pond5's customers, including Plaintiffs and putative class members, can view and download more than 42 million prerecorded videos from Pond5's website. Unbeknownst to Plaintiffs, their identities and a record of every video clip they viewed or downloaded, was disclosed by Defendant to a third party, Meta Platforms, Inc. ("Meta") (formerly known as Facebook). Plaintiffs' Complaint alleges in detail all facts necessary to establish that Defendant's conduct violated the Video Privacy Protection Act, 18 U.S.C. §§ 2710 *et seq*.

The motion before the Court concerns Defendant's effort to avoid a well-pled claim based on Defendant's unlawful disclosure of their customers' identities and video-viewing habits. Defendant seeks dismissal on the grounds that Plaintiffs purportedly lack standing and that they have failed to state a claim. Each of Defendant's arguments is without merit. The motion should be denied and Plaintiffs should be permitted to attempt to vindicate their privacy rights and the privacy rights of the putative class of similarly-situated persons in this Court.

## II. SUMMARY OF ALLEGATIONS FROM PLAINTIFFS' COMPLAINT

The Video Privacy Protection Act ("VPPA"), 18 U.S.C. §§ 2710 *et seq.*, prohibits "[a] video tape service provider [from] knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information ("PII") as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). *See* Complaint ("Comp."), Dkt. 1, ¶¶ 13-15.

Defendant Pond5, Inc. develops, owns, and operates a service which, Plaintiffs allege, features over 42 million prerecorded videos on its website. Comp., ¶ 3. Defendant makes money by permitting consumers to download individual pre-recorded stock videos and by offering paid monthly

or yearly subscriptions to its library of prerecorded videos. *Id.*, ¶¶ 3, 16-18. The purchase price of individual prerecorded videos starts at $25 and the price for the video subscription service is either $199 for a monthly subscription or $999 for a yearly subscription. *Id.* at ¶ 17 & fig. 1.

Unbeknownst to Plaintiffs, a record of each video they chose to view, purchase, or download was released or disclosed by Pond5 to Meta along with each Plaintiffs' Facebook ID through Meta Pixels embedded by Defendant on its website. Comp., ¶¶ 4-5, 33-43, 52, 58. Plaintiffs allege that the Facebook ID can be used by an ordinary person, and is used by Meta, to link a computer user to a Facebook account or profile. *Id*, ¶¶ 35, 42. Plaintiffs further allege that the personal information publicly listed on a Facebook account or profile includes a person's first and last name. *Id.*, ¶ 42. Thus, the information disclosed by Pond5 to Meta is PII within the meaning of the VPPA. And, accordingly, Plaintiffs allege Defendant violated the VPPA by disclosing Plaintiffs' and putative class members' PII to Meta. *Id.*, ¶¶ 77-86.

## III. ARGUMENT

### A. Plaintiffs Have Standing to Pursue Their Claims

To establish Article III standing, a plaintiff must have suffered an injury in fact that is fairly traceable to the challenged conduct and likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). A plaintiff establishes injury in fact when he has suffered an invasion of a legally protected interest that is "concrete and particularized," meaning the injury must "actually exist" and "must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339-40 (2016). "At the pleading stage, general factual allegations of injury resulting from defendant's conduct may suffice, for on a motion to dismiss [the court must] 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561 (citations omitted); *see also Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (plaintiff's burden to demonstrate standing is commensurate with the stage of litigation).

In *TransUnion LLC v. Ramirez*, the Supreme Court held that, "[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." 594 U.S. 413, 427 (2021) (emphasis in original). Thus, "under Article

III, an injury in law is not an injury in fact." *Id.* The Court further clarified, however, that, "[v]arious intangible harms" that "are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts"—such as "reputational harms, disclosure of private information, and intrusion upon seclusion"—can be considered concrete. *Id.* at 425.

As recognized by this Court, "prior to *TransUnion*, courts ... consistently found that plaintiffs satisfy the concreteness requirement of Article III standing where they allege a deprivation of their privacy rights under the VPPA." *Salazar v. Nat'l Basketball Ass'n*, 685 F. Supp. 3d 232, 240 (S.D.N.Y. 2023); *see also Austin-Spearman v. AMC Network Entm't LLC*, 98 F. Supp. 3d 662, 666–67 (S.D.N.Y. 2015) ("[E]very court to have addressed this question has reached the same conclusion, affirming that the VPPA establishes a privacy right sufficient to confer standing through its deprivation[.]") (collecting cases). And, since *TransUnion* courts, including this Court, have continued to reach that same conclusion. *See Addi v. Intl. Bus. Machines, Inc.*, No. 23 CIV. 5203, 2024 WL 2802863, at *3 (S.D.N.Y. May 31, 2024) (In light of *TransUnion*, "this Court has consistently found that 'because the VPPA creates a specific right to relief for disclosures made in violation of the statute, a plaintiff asserting claims under the VPPA need only assert [her] information was wrongfully disclosed to have asserted an 'injury in fact' supporting Article III standing.'" (citing *Collins v. Pearson Educ., Inc.,* No. 23 CIV. 2219, 2024 WL 895316, at *3 (S.D.N.Y. Mar. 1, 2024); *Alex v. NFL Enterprises LLC*, No. 22-CV-09239, 2023 WL 6294260, at *3 (S.D.N.Y. Sept. 27, 2023); *Martin v. Meredith Corp.*, 657 F. Supp. 3d 277, 283 (S.D.N.Y. 2023), *appeal withdrawn*, No. 23-412, 2023 WL 4013900 (2d Cir. May 24, 2023); *Carter v. Scripps Networks, LLC*, 670 F. Supp. 3d 90, 94-95 (S.D.N.Y. Apr. 24, 2023)).

And this makes sense because, as the Second Circuit has observed, the "core alleged harm—that [a plaintiff's] personal information was disclosed to a third party, without his consent, in violation of the VPPA—'has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts'; public disclosure of private facts." *Salazar v. Nat'l Basketball Ass'n.*, 118 F.4th 522, 537 (2d Cir. Oct. 15, 2024) (quoting *Transunion*. 594 U.S. at 417). *See also, e.g., Martin v. Meredith Corp.*, 657 F. Supp. 3d at 282-83 (holding that VPPA claim alleged concrete injury sufficient to establish standing where plaintiff's video-watching activity on people.com was

purportedly disclosed to Facebook, noting that *TransUnion* cited the disclosure of private information as a type of traditional harm capable of redress); *Carter v. Scripps Networks, LLC*, 670 F. Supp. 3d at 95-96 ("As noted in *TransUnion* and Judge Cote's decision in *Martin* [*v. Meredith Corp.*], disclosure of private information is a harm that courts have traditionally considered to be redressable. Therefore, at the pleading stage, defendants' alleged disclosure of plaintiffs' personal information and viewing activities describes traditionally recognized harm. [Defendant]'s motion to dismiss on standing grounds will therefore be denied." (footnote omitted)); *Pileggi v. Washington Newspaper Publ'g Co., LLC,* No. CV 23-345, 2024 WL 324121, at * 5 (D.D.C. Jan. 29, 2024) (holding, in VPPA case, that "the alleged unlawful 'disclosure of [a plaintiff's] information to a third party' ... bears 'a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts,' ... including the common-law tort of intrusion upon seclusion that the Supreme Court in *TransUnion* expressly identified as among the 'intangible harms' 'qualify[ing] as concrete injuries under Article III.'" (citations omitted)); *Cantu v. Tapestry, Inc.*, No. 22-cv-1974, 2023 WL 4440662, at *4 (S.D. Cal. July 10, 2023) ("the concreteness requirement for Article III standing is satisfied when a consumer alleges that his data has been impermissibly disclosed in violation of the [VPPA]." (citing *Eichenberger v. ESPN*, 876 F.3d 979, 983 (9th Cir. 2017)); *Pratt v. KSE Sportsman Media, Inc.*, 586 F. Supp. 3d 666, 678 (E.D. Mich. 2022) (plaintiffs identified a concrete harm under a state law analog to the VPPA by alleging that defendants "violated Plaintiffs' statutorily conferred right to privacy in their reading habits—an intangible harm presenting ample constitutional mooring for Article III purposes.").

Defendant asserts that the instant case is different because Plaintiffs are, somehow, not "consumers" that the VPPA was intended to protect, or that, otherwise, their claim under the VPPA "does not bear 'a close relationship' to traditional privacy harms." Defendant's Motion to Dismiss (Dkt. 17) ("MTD"), pp. 8-9. Defendant cites no relevant authority for the proposition that only some violations of the VPPA are sufficient to meet the concreteness requirement of Article III. The cases cited by Defendant are entirely inapposite. In *Osheke v. Silver Cinemas Acquisition Co.*, for example, the court considered whether the VPPA covered the purchase of movie tickets on a movie theatre website, holding that it does not because "[m]ovie theatres do not rent movies, sell movies or deliver

movies; they 'show' movies," and noting that "[t]here is nothing in the legislative record to indicate or even suggest that the VPPA was intended to cover public acts [such as watching a movie in a movie theater]." 700 F. Supp. 3d 921, 925-26 (C.D. Cal. 2023). But, Plaintiffs do not allege that they watched Pond5 videos solely in public or downloaded videos from Pond5 solely for public use. And Defendant cannot simply insert its own unfounded and inaccurate allegations such as that Plaintiffs "seek to apply the VPPA not to their private viewing of videos but to their use of a commercial license to display videos they downloaded to the public," MTD, p. 7, into Plaintiffs' Complaint.

Relatedly, Defendant cites two further cases for the proposition that "[t]here is nothing 'sensitive' or 'confidential' about content that third-party creators intend to share with the public." MTD, p. 9. Neither of these cases, however, applies to the VPPA. *See McCarthy v. Barrett*, 804 F. Supp. 2d 1126, 1145 (W.D. Wash. 2011) (42 USC § 1983 action alleging violations of First, Fourth, and Fourteenth Amendments); *United States v. Meregildo*, 883 F. Supp. 2d 523, 525 (S.D.N.Y. 2012) (addressing Fourth Amendment privacy right). And, regardless, Plaintiffs have not alleged, and Defendant has not established, that Plaintiffs "voluntarily posted" their video-viewing and video-downloading habits on "public websites or listservs" or otherwise "voluntarily expose[d]" them to the public. *McCarthy*, 804 F. Supp. 2d, at 1145.

Defendant also cites two cases as support for the following related statement: "[a]s courts since *TransUnion* have explained, in the context of informational privacy, only the 'dissemination or misuse of sensitive and confidential information' is protected." MTD, 8:14-18. The first case cited, however, *In re Yahoo Mail Litig.*, was decided in 2014, long before *TransUnion*, addressed the protections offered by the California Constitution, not the VPPA, and did not address any issues relating to standing because the motion before it was brought under Rule 12(b)(6). *See* 7 F. Supp. 3d 1016, 1024, 1041 (N.D. Cal. 2014). In brief, the court in *In re Yahoo Mail Litig.* addressed the issue of whether the plaintiffs, in that case, had successfully stated a claim for relief under the California Constitution based on their allegations that "Yahoo scans, analyzes, collects, and stores user information [from their emails] without their consent." *Id.* at 1021. It is patently irrelevant to the instant case.

The second case cited by Defendant for the same proposition, *Barclift v. Keystone Credit*

*Servs. LLC*, is no more helpful to it. In *Barclift*, the court considered whether an alleged violation of the Fair Debt Collection Practices Act ("FDCPA") was sufficient to establish Article III standing. 585 F. Supp. 3d 748 (E.D. Pa. 2022). The court analyzed whether the "mailing vendor theory" pursued by plaintiff "establishes a concrete harm." *Id.* at 757.[1] Having reviewed the specific allegations in that case, the court agreed with the "majority of district courts" that had "determined that the mailing vendor theory does not establish a concrete injury." *Id.* (collecting cases). It based this decision, in part, on its conclusion that "Barclift has not alleged that she suffered a concrete injury because her privacy information was never publicized." *Id.* at 759. This is, again, completely irrelevant to the instant case. It concerns a different statute, the violation of which "does not bear a close enough relationship" to a "'harm 'traditionally' recognized as providing a basis for a lawsuit in American courts.'" *Id.* at 758 (quoting *TransUnion*, 594 U.S. at 424).

Importantly, in *Salazar v. Nat'l. Basketball Ass'n.*, the Second Circuit found the analogy between mail vendor cases and the VPPA case before it to be "inapt." 118 F.4th at 543. It explicitly rejected the argument that the mail vendor cases were "on all fours" with the VPPA case before it "because they all involve 'limited disclosures to a single legitimate business.'" *Id.* at *8. The Court of Appeals found, first, "Meta isn't a 'ministerial intermediary' like a mail vendor, . . . it's one of the world's largest companies, employing more than 67,000 people, with 2024 revenues exceeding $142 billion." *Id.* (citations omitted). Second, the court noted, "Meta's use of the disclosed data is very different from that of the mail vendor. Unlike in the mail vendor cases, [plaintiff] doesn't allege that his personal viewing information was disclosed to an intermediary so that it could be bounced back to him on behalf of the entity that properly possessed the information." *Id.* Instead, "[o]ne of [plaintiff]'s allegations is that [defendant] discloses users' personal viewing information to Meta, which then harnesses that information 'to show the user targeted ads' . . . . Moreover, nothing in the complaint suggests that Meta can't sell, disclose, or otherwise use [plaintiff]'s data for additional

---

[1] The FDCPA regulates how debt collectors may collect consumer debts. One provision of the act prohibits debt collectors from communicating "with any person other than the consumer" in "connection with the collection of a debt." 15 U.S.C. § 1692c(b). Plaintiff Barclift alleged that Keystone Credit Services, LLC, violated the FDCPA by using a mailing vendor in order to send her a collection letter. *See Barclift v. Keystone Credit Servs. LLC*, 585 F. Supp. 3d, at 750-51.

purposes. In addition, [plaintiff] alleges that Meta 'cross-referenc[es]' 'this highly sought-after information' 'to the data it already has in [its] own detailed profiles.'" *Id.* The court concluded:

> Given the nature of the companies involved, intended and potential uses of the disclosed information, and resulting enhanced disclosure risks, we see little daylight between the nature of the harm [plaintiff] alleges and the harm flowing from the public disclosure of private facts common-law analog. Therefore, [plaintiff] has satisfactorily pled a concrete injury sufficient to confer Article III standing and to withstand dismissal under Rule 12(b)(1).

*Id.*

In these material respects, Plaintiffs allegations, in the instant case, are substantively identical to those considered, and found sufficient to plead injury under Article III, by the Second Circuit. First, Plaintiffs allege that "Meta . . . is the world's largest social media company. Meta reported having 2 billion active daily users as of March 2023, and reported $116.61 billion in revenue in fiscal year 2022." Comp. ¶ 24. And, second, Plaintiffs have alleged, in detail, that Meta's revenue is derived almost entirely from selling targeted advertising, *id.* ¶ 25, that Meta targets users effectively by surveilling user activity both on and off its site, *id.* ¶ 27, and that Meta receives information gathered by the Meta Pixel and "processes it, analyzes it, and assimilates it into Meta's datasets and profiles," *id.* ¶¶ 27-32. Moreover, Plaintiffs do not allege, nor is it true, that Meta is in some way unable to disclose or use Plaintiffs' data for additional purposes. *Salazar*, 2024 WL 4487971, at *8. Defendant is, then, quite wrong to suggest that the disclosure of Plaintiffs' PII to Meta does not constitute public disclosure of private facts: the Second Circuit has squarely rejected Defendant's implied argument that disclosure to Meta, as alleged in Plaintiffs' Complaint, is not public disclosure sufficient to confer standing.

Rather than an attack on Plaintiffs' standing to sue, Plaintiffs suggest that Defendant's argument is perhaps best understood as an attack on the merits of Plaintiffs' VPPA claim. The Second Circuit has explicitly "cautioned against arguments that 'would essentially collapse the standing inquiry into merits, *Baur v. Veneman*, 352 F. 3d 625, 642 (2d Cir. 2003), and attempts to 'conflate the threshold question of [the plaintiff's] standing under Article III . . . with the question of whether [he] has a valid claim on the merits,' *Lerman v. Bd. of Elections*, 232 F. 3d 135, 143 n. 9 (2d Cir. 2000)." *SM Kids, LLC v. Google LLC*, 963 F. 3d 206, 212 (2d Cir. 2020). In *Cantu v. Tapestry, Inc.*,

the defendant argued, similarly to the instant case, that the plaintiff lacked Article III standing because "the information disclosed [wa]s not PII within the meaning of the VPPA, and he ha[d] not adequately alleged that he was a consumer as defined by the Act." 2023 WL 4440662, at *7 (S.D. Cal. July 10, 2023). The court in *Cantu* held that it would not "consider these arguments as part of Defendant's Rule 12(b)(1) motion because they attack the merits of Plaintiff's VPPA claim, not his standing to sue." *Id.* at 7, n.5 (citing *Williston Basin Interstate Pipeline Co. v. An Exclusive Gas Storage Leasehold & Easement in the Cloverly Subterranean Geological Formation*, 524 F.3d 1090, 1094 (9th Cir. 2008) ("As a general rule, when '[t]he question of jurisdiction and the merits of [the] action are intertwined,' dismissal for lack of subject matter jurisdiction is improper." (citation omitted) (alterations in original))). The Court should take the same approach here, where Defendant is effectively arguing, albeit erroneously, that Plaintiffs, Pond5, and/or the specific conduct alleged by Plaintiffs do not fall within the scope of the VPPA.

### B. Plaintiffs Have Met the 12(b)(6) Requirements for Alleging their VPPA Claim

#### 1. *Applicable Legal Standard*

Under Fed. R. Civ. P. 12(b)(6), the claims asserted in a Complaint withstand dismissal for failure to state a claim where Plaintiffs plead "enough facts to state a claim [for] relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "In evaluating a Rule 12(b)(6) motion, 'the court must accept the material facts alleged in the complaint as true,' *Cohen v. Koenig*, 24 F. 3d 1168, 1172 (2d Cir. 1994), and must not dismiss the action 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief.' *Conley v. Gibson*, 355 U.S. 41, 45 (1957)." *Walsh v. McGee*, 918 F. Supp. 107, 112 (S.D.N.Y. 1996). Furthermore, '"[t]he motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted.'" *Id.* (internal quotation omitted). Even "when a complaint is dismissed pursuant to Rule 12(b)(6) and the plaintiff requests permission to file an amended complaint, that request should ordinarily be granted." *Ricciuti v. N.Y.C. Transit Authority*, 941 F. 2d 119, 123 (2d Cir. 1991) (citing *Branum v. Clark*, 927 F. 2d 698, 705 (2d Cir. 1991); *Salahuddin v. Cuomo*, 861 F. 2d 40, 42 (2d Cir. 1988)). Fed. R. Civ. P. 15(a) provides that leave to amend "shall be freely given when justice so requires," and "it is rare that such leave should be denied, *see Foman v. Davis*, [371 U.S. 178, 182

(1962)], especially when there has been no prior amendment." *Ricciuti*, 941 F. 2d, at 123.

### 2. *Plaintiffs' VPPA Claim is Not Time-Barred*

The VPPA provides: "No action may be brought under this subsection unless such action is begun within 2 years from the date of the act complained of or the date of discovery." 18 U.S.C. § 2710(c)(3) (emphasis added). When a "discovery rule" applies, as under the VPPA, "the statute of limitations begins to run from the date on which the plaintiff discovers, or with due diligence reasonably should have discovered, that he has suffered an injury." *Frulla v. CRA Holdings, Inc.*, 596 F. Supp. 2d 275, 289 (D. Conn. 2009) (citations omitted).

Plaintiffs allege that that they "did not discover and could not reasonably have discovered that Defendant was disclosing and releasing their [PII] in the ways set forth in this Complaint until shortly before this lawsuit was filed in consultation with counsel." Comp. ¶ 61. They further allege that "Defendant failed and continues to fail to disclose to website visitors, including Plaintiffs . . . , that by interacting with Pond5's website their PII would be disclosed or released to Meta and other unauthorized third parties." *Id.* at ¶ 65. With respect to Defendant's Privacy Policy in particular, Plaintiffs allege: "Defendant's Privacy Policy does not inform Defendant's customers that their [PII] will be disclosed to unauthorized third parties such as Meta as described in this Complaint." *Id.* ¶ 63. And, Plaintiffs allege that, "Defendant has exclusive knowledge [regarding] . . . the information [the Meta Pixel incorporated into Defendant's website is] . . . configured to collect and disclose." *Id.* ¶ 65. These allegations are more than sufficient to establish that the applicable statute of limitations should be tolled on the basis that Plaintiffs were "'blamelessly ignorant of the existence or cause of [their] injury,'" *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 801 (2d Cir. 2014) (quoting *Barrett v. United States,* 689 F.2d 324, 327 (2d Cir. 1982)).

Defendant argues, erroneously, that its Privacy Policy informed Plaintiffs that their PII would be disclosed to Meta. MTD, p. 14. This is patently false. In fact, the portions of Defendant's Privacy Policy quoted and cited by Defendant indicate only that Defendant's website contains third-party tracking pixels and, vaguely, that they are "used to track user behavior." *Id.* Nothing in the quoted language or any other portion of the Privacy Policy notifies users that their PII – their personal identifiers and details of their video-viewing habits – will be disclosed to Meta. As discussed in more

detail below, see *infra* Part III.B.5, there is a clear difference between "user behavior" and "usage data," on the one hand, and PII, within the meaning of the VPPA, on the other. The former terms – which could describe any number of types of anonymized or pseudonymized browsing data – are completely inadequate as referents to the personal identifiers and records of video views and purchases that were actually disclosed to Meta. Thus, Plaintiffs Nixon and Fleming were blamelessly ignorant until July 8, 2024, and July 10, 2024, respectively, when they discovered that Pond5 had "surreptitiously collected and transmitted [their PII]." Comp. ¶¶ 53, 59. And, on that basis, the statute of limitations should be tolled and Plaintiffs' claims should be permitted to proceed.

Defendant notes that Plaintiffs, now, in their Complaint, are able to show how the Meta Pixel on Defendant's website operates to share the titles of videos watched and purchased by users. MTD, pp. 13-14. Defendant then complains: "Plaintiffs offer no reason why they could not have viewed similar diagrams from their web browser until recently." *Id.* p. 14. But, Defendant's argument is entirely unreasonable. There is no authority for the suggestion that a statute of limitations will not be tolled if a party could, conceivably, have discovered the existence of their injury earlier. The critical fact is that Plaintiffs did not understand, and had no reason to understand, prior to July 2024, that their PII was being disclosed to Meta. They were under no obligation to routinely run specialized tools on Defendant's website prior to July 2024 to confirm that it was not violating the VPPA or any other statute; and no blame can attach for their failure to do so.

The VPPA's statute of limitations should also be tolled on the independent, but related, basis that Defendant fraudulently concealed the existence of its VPPA violations, *see In re Nat. Gas Commodity Litig.*, 337 F. Supp. 2d 498, 513 (S.D.N.Y. 2004). Defendant argues that this doctrine is inapplicable because, Defendant asserts, Plaintiffs have not identified specific false or misleading statements made by Defendant. MTD, pp. 12-13. But this ignores the nature of Defendant's fraudulent conduct. Because Plaintiffs' allegations of fraudulent concealment rest upon Defendant's failure to meet its obligation to notify users of its disclosure of PII to unauthorized third parties, including Meta, Plaintiffs are required only to set forth: "'the person responsible for the failure to speak, the context of the omission, and the manner in which the omission misled the plaintiff.'" *Solutia Inc. v. FMS Corp.*, 456 F. Supp. 2d 429 (S.D.N.Y. 2006) (quoting *Odyssey Re (London) Ltd. v. Stirling Cooke*

*Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000)). They have more than met these requirements. Plaintiffs allege that:

> Defendant tracks, collects and discloses its customers' and subscribers' information without their knowledge or consent. The Meta Pixel and/or other tracking tools work in the background of Defendant's website to track, collect and disclose subscribers' information in a way that is not visible to subscribers. And, Defendant does not inform its subscribers that their information is being tracked, collected and disclosed.

Comp., ¶ 5. Plaintiffs further allege that Defendant did not "seek, let alone receive, 'informed, written consent' from Plaintiff[s] . . . , 18 U.S.C. § 2710(b)(2)(B), and it consequently never provides them the opportunity to withdraw any such consent." *Id.* ¶ 82. Thus, Plaintiffs have adequately alleged with sufficient particularity that Defendant was required to seek informed consent – which necessarily requires Defendant to inform Plaintiffs that it was disclosing their PII to Meta, and that Defendant failed to seek informed consent or to otherwise notify Plaintiffs that their PII was being collected and disclosed to Meta.

3. *Pond5 is a Video Tape Service Provider Under the VPPA*

Under the VPPA, a "video tape service provider" is "any person, engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4). The Second Circuit has observed the "broad language" used in this definition. *Salazar v. Nat'l. Basketball Ass'n.*, 118 F.4th at 547. It further noted, "Congress cast a wide net in defining 'video tape service provider,' to ensure that businesses dealing in audiovisual goods or services satisfy the definition even if they *also* deal in non-audiovisual goods or services." *Id.* at 548. Put another way, the Second Circuit held, "'video tape service provider' is defined broadly to include even those businesses that *dabble* in video rentals." *Id.* (emphasis added).

Plaintiffs allege that Defendant's website offers its customers and subscribers "over 42 million pre-recorded videos to watch, purchase and download," Comp. ¶ 18, and that customers have the option to either purchase individual pre-recorded stock videos or to subscribe to a monthly or yearly subscription service which permits them a certain number of periodic video downloads*, id.* ¶ 3. Thus, Pond5, which "operates a stock video service by which its users can purchase and download prerecorded videos," *id.* at ¶ 16, falls squarely within the definition of a "video tape service provider."

Indeed, as courts have recognized:

> [t]he requirement that a defendant be 'engaged in the business ... of rental, sale, or delivery' of video content is typically **straightforward to apply in cases in which the defendant directly rents or sells video content or access to such content over the internet**. *See, e.g., Cappello v. Walmart, Inc.*, No. 18-CV-06678-RS, 2019 WL 11687705, at *2 (N.D. Cal. Apr. 5, 2019) (permitting claim against Walmart, a business that sold video media products through its website); *Cantu v. Tapestry, Inc.*, No. 22-cv-1974-BAS-DDL, 2023 WL 4440662, at *8 (S.D. Cal. July 10, 2023) (explaining that the type of sale at issue in *Cappello* is directly analogous to the conduct motivating the passage of the VPPA); *Ambrose v. Bos. Globe Media Partners LLC*, No. 21-10810-RGS, 2022 WL 4329373, at *1-2 (D. Mass. Sept. 19, 2022) (permitting claim against the Boston Globe because it provided "hundreds, if not thousands, of videos" to users through its website in exchange for a paid digital subscription); *Czarnionka v. Epoch Times Ass'n, Inc.*, No. 22 Civ. 6348 (AKH), 2022 WL 17069810, at *4 (S.D.N.Y. Nov. 17, 2022) (same, for the Epoch Times).

*Tawam v. Feld Entertainment Inc.*, 684 F.Supp.3d 1056, 1060 (S.D. Cal. July 28, 2023) (emphasis added).

Defendant concedes that it offers pre-recorded stock videos, but asserts that "this is only a portion of what Pond5 offers," that videos represent "only about a third of the individual assets available" on Defendant's website, and that a consumer could "pay for creative assets on Pond5 without ever downloading a single video." MTD, p 16. Defendant relies on out-of-circuit cases for the proposition that "'to be engaged in the business of delivery video content, the defendant's product must not only be substantially involved in the conveyance of video content to consumers but also significantly tailed to serve that purpose.'" MTD, p. 15 (quoting *In re Vizio*, *Inc. v. Consumer Privacy Litig.,* 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017)). In *Salazar*, as noted above, the Second Circuit held that to be a video tape service provider an entity must merely "dabble" in video rentals. *Salazar v. Natl. Basketball Assn.*, 118 F.4th at 549. Pond 5, which offers 42 million videos certainly does more than dabble in the sale, rental, and delivery of videos to its users.

Even applying the standard suggested by Defendant, there is no question that Pond5 is a video tape service provider within the meaning of the VPPA. In that regard, Defendant's attempts to diminish the importance of pre-recorded video assets to its business are undercut by its own evidence. In terms of mere numbers, the Stock Video Footage section of Pond5's website lists "43,352,320 Stock Video Footage royalty-free stock footage and videos." Decl. of Mark David McPherson

("McPherson Decl."), Dkt. 18, Ex. C (Stock Video Footage section). That same section of Pond5's website contains a search bar which invites the user to "[s]earch the world's largest collection of stock videos . . . ." *Id* (emphasis added). This belies the notion that the delivery of video content is merely peripheral to Defendant's business. Moreover, while "[t]he number of videos on a website may help answer the ultimate question of whether a company is engaged in the business of providing video content," and "the fact that a company has thousands of videos on its website may indicate that its business model hinges on the monetization of audio-visual content," still, "[t]he central inquiry remains whether the company is 'engaged in the business' of providing video content." *Cantu v. Sunrun Inc.*, No. 23-cv-974, 2023 WL 11795670, at *3 (S.D. Cal. Nov. 22, 2023).

And, Plaintiffs have adequately alleged that the delivery and sale of pre-recorded video content is a "focus of defendant's work." *See Cantu v. Tapestry, Inc.*, 2023 WL 4440662, at *8. On this point, Plaintiffs allege, "Pond5 is a stock video seller," "Pond5's customers have the option to either purchase individual pre-recorded stock videos or subscribe to a monthly or yearly subscription service," and "Pond5's video library contains 'over 42 million stock videos.'" Comp. ¶ 3. Moreover, the evidence introduced by Defendant confirms precisely what Defendant seeks to deny. As an example, the first paragraph of Pond5's description of itself reads:

> Pond5 exists to create world-class storytellers, and we do so by building the world's most accessible marketplace of media assets video creators need to tell stories, share knowledge, and inspire audiences. With 35+ million video clips, award-winning tools including patented Visual Search for video, and integrations for all major video-editing software, Pond5 is the go-to video marketplace for filmmakers, medial organizations, and marketers worldwide.

McPherson Decl., Ex. A ("About Us" section of Pond5's website). And a review of Pond5's website confirms the centrality of video sales and delivery to Pond5's business. The main statement on the homepage of Pond5's website is: "Stunning Stock video, a search away." Decl. of Julian Hammond (Hammond Decl.), filed concurrently herewith, ¶ 3, Exh. A. The sub-heading reads, "Save time and money with high-quality footage by professional artists from around the world." *Id.* Midway down the homepage of Pond5's website is a search option which permits the user to tab through various types of media to search. Video is pre-selected as the default option. Within the search bar is the

phrase: "Search the world's largest collection of stock videos . . . ." *Id.* When a user scrolls down on Pond5's homepage, a search bar appears at the top of the page which also advertises, "Search the world's largest collection of stock videos." *Id.* ¶ 4, Ex. B. To the left of that search bar is a drop-down menu which permits the user to choose from various types of media they can search. *Id*. The pre-selected option, if they do not use the drop-down menu, is "Video." *Id.* If the user does utilize the drop-down menu, the first category – with four sub-categories – is "VIDEO." *Id.* ¶ 4, Ex. C. Finally, a menu is available at the top right of the page. Clicking on the menu logo causes a menu to pop-up with the first item on that menu being "Video," followed by four sub-categories ("Creative Footage," "News & Archival Footage," "Exclusive Footage," and "Vertical Videos"), before listing other categories. *Id.* ¶ 5, Ex. D. Defendant's claim, then, that it is only 'peripherally or passively involved in video content delivery' is entirely incredible.

In addition, Defendant offers no relevant authority for its implicit claims that in order for Pond5 to be a video tape service provider, the majority of assets available on its website would have to be videos, or that all users would have to necessarily view or download one of its many millions of pre-recorded videos. The two cases cited by Defendant in which a complaint was found not to have sufficiently alleged that a defendant was a video tape service provider involved defendants that hosted prerecorded videos for the purpose of marketing their products. *See Cantu v. Tapestry, Inc*, 697 F. Supp. 3d 989; *Carroll v. General Mills, Inc.*, No. 23-cv-1746, 2023 WL 4361093 (C.D. Cal. June 26, 2023). To be clear, both Tapestry, Inc., "a holding company for several high fashion brands, including Coach," *Cantu v. Tapestry*, 697 F. Supp. 3d at 991, and General Mills, the owner of the General Mills and Betty Crocker brands, *Carroll v. General Mills*, 2023 WL 4361093 at *1, hosted videos on their respective websites "as part of 'brand awareness'" and the videos were used "for marketing purposes" and were "not [d]efendant's product." *Cantu v. Tapestry*, 697 F. Supp. 3d at 994. These cases are, then, patently distinguishable from the instant case where Pond5 prominently promotes, and a significant part of its business model relies upon, the sale and delivery of pre-recorded video content to its users. And, regardless, as noted above, the Second Circuit has adopted a broader interpretation of the term video tape service provider which clearly encompasses Pond5.

Finally, Defendant also fails to offer any authority for the suggestion that the applicability of the definition of "video tape service provider" to an entity depends on the purposes for which that entity offers the audio-visual materials it rents, sells, or delivers. MTD, p. 17. Nor is there any suggestion in the statutory definition which would support a purpose-based exception to the statutory definition of video tape service provider.

*4. Plaintiffs Adequately Allege Disclosure of Personally Identifiable Information*

The VPPA defines "personally identifiable information" to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). There is a circuit split over precisely what constitutes "personally identifiable information." "Under the broader approach, adopted by the First Circuit, PII encompasses 'information reasonably and foreseeably likely to reveal which [ ] videos [a person] has obtained' to the third party to whom the PII is disclosed," *Golden v. NBC Universal Media, LLC*, 688 F. Supp. 3d 150, 159 (S.D.N.Y. 2023) (quoting *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F. 3d 482, 486 (1st Cir. 2016) (emphasis added)). Under the narrower approach, adopted by the Third and Ninth Circuits, PII constitutes "only that information that would 'readily permit an ordinary person to identify a specific individual's video-watching behavior,'" *Eichenberger v. ESPN*, 876 F.3d at 985 (quoting *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 267 (2016) (emphasis added)). "The Second Circuit has not yet spoken on this point." *Golden v. NBC Universal Media*, 688 F. Supp. 3d at 159.

Should this Court adopt the First Circuit's broader approach, there is no question, and Defendant does not even dispute, that Defendant has disclosed Plaintiffs' PII. Even under the narrower approach, however, "[c]ourts have uniformly held Facebook IDs to constitute PII under the VPPA." *Golden v. NBC Universal Media*, 688 F. Supp. 3d at 159. And, this is particularly true where, as in the instant, "the plaintiff alleges that her Facebook ID was disclosed alongside the viewed video's URL and name." *Id.* (collecting cases).

In the instant case, Plaintiffs allege that "[s]tarting on or about February 2018 and continuing to the present, [Pond5] embedded and/or allowed to be embedded the Meta Pixel on its website – www.pond5.com – and transmitted Plaintiffs' . . . . Personal[ly] Identifiable Information, including

their personal identifiers, without their consent, to Meta in accordance with the Meta Pixel's configuration." Comp., ¶ 33. They further allege that "[t]he cookies that were transmitted as a result of the Meta Pixels that Defendant installed on its website conveyed Plaintiffs'. . . Facebook IDs (through the c_user cookie), which can be used by Facebook and any ordinary person to find the user's real name." *Id.,* ¶ 35. Plaintiffs also explain that "[a]nyone can identify a Facebook profile – and all personal information publicly listed on that profile, <u>including a person's first and last name</u> – by appending the Facebook ID [FID] to the end of Facebook.com." *Id.*, ¶ 42. And, Plaintiffs further explain that "Facebook describes itself as a 'real identity platform,' meaning users are allowed only one account and must share 'the name they go by in everyday life.' Therefore, when users create an account, they must provide their first and last name, along with their birthday and gender." *Id.*, ¶ 26. Moreover, Plaintiffs further allege that, alongside their FIDs, the "titles of the videos" they watched were disclosed to Meta. *See, e.g., id.* ¶¶ 34, 37-40, 43. Thus, Plaintiffs have adequately alleged that their PII was disclosed to Meta. *See Harris v. Pub. Broad. Serv.*, 662 F.Supp.3d 1327, 1334 (N.D. Ga. 2023) ("[T]he bundling of the [Facebook ID] from the c_user cookie with the URLs of the videos Plaintiff watched" through the Facebook pixel alleged PII); *Sellers v. Bleacher Rep., Inc.*, No. 23-CV-00368, 2023 WL 4850180, at *4 (N.D. Cal. July 28, 2023) ("The FID is a unique identifier that is enough, on its own, to identify a person."); *Jackson v. Fandom, Inc.*, No. 22-CV-04423, 2023 WL 4670285, at *4 (N.D. Cal. July 20, 2023) ("[T]he Court may reasonably infer that an ordinary person could readily identify a specific Facebook user on the basis of a Facebook Profile ID.")); *Belozerov v. Gannett Co.*, 646 F.Supp.3d 310, 314 (D. Mass. 2022) (collecting cases) ("A Facebook ID meets the broad definition of PII in this circuit."); *Czarnionka v. Epoch Times Association, Inc.*, No. 22 Civ. 6348, 2022 WL 17069810, at *3 (S.D.N.Y., Nov. 17, 2022) (Facebook ID was PII); *Lebakken v. WebMD, LLC*, 640 F. Supp. 3d 1335, 1342 (N.D. Ga. 2022) ("[Plaintiff] adequately alleged that [defendant] disclosed her Facebook ID and email address in connection with her video viewing information to Facebook and that the disclosure of such information constituted a disclosure of PII."); *Ellis v. Cartoon Network, Inc.*, No. 14 Civ. 484, 2014 WL 5023535, at *3 (N.D. Ga. Oct. 8, 2014) ("[T]he disclosure of a Facebook ID, which can identify a specific person without any additional steps, does qualify as personally identifiable information."), *aff'd on other grounds*, 803

F.3d 1251 (11th Cir. 2015).

Defendant is quite wrong to suggest that Plaintiffs have failed to allege that their Facebook pages contain any personal information, such that the disclosure of their FIDs constitutes the disclosure of PII. MTD, p. 20. To the contrary, as detailed above, Plaintiffs have alleged that, by using an FID, "[a]nyone can identify a Facebook profile – **and all personal information publicly listed on that profile, including a person's first and last name** . . . ." Comp. ¶ 42 (emphasis added). Thus, Plaintiffs clearly allege that their Facebook pages, as do all Facebook profiles, include their respective first and last names. *See also id.* ¶ 35 (alleging that Facebook ID "can be used by . . . any ordinary person to find the user's real name.").

Defendant also erroneously suggests that Plaintiffs have only alleged that their encrypted FIDs were shared with Meta. In fact, Plaintiffs explain in detail that when "[a] visitor who has not logged out of Facebook while watching and/or downloading a video on Pond5's website will transmit the c_user cookie to Facebook. The c_user cookie contains that visitor's unencrypted Facebook ID." Comp. ¶ 41. Plaintiffs further allege that throughout the periods during which they were, respectively, viewing and downloading videos from Pond5's website, they owned their respective Facebook and/or Instagram accounts and used these accounts during the same period. *Id.* ¶¶ 7-8. And, they specifically allege that "[t]he cookies that were transmitted as a result of the Meta Pixels that [Pond5] installed on its website <u>conveyed Plaintiffs' . . . Facebook IDs (through the c_user cookie)</u> . . . . *Id.* ¶ 35.

Finally, Defendant asserts, without further explanation, that Plaintiffs do not "allege how 'an ordinary person' could identify their video viewing behavior based on information transmitted to Facebook." MTD, p. 20. In making this argument, it appears that Defendant has erroneously "conflate[d] the type of information disclosed with the recipient of its disclosure. The VPPA addresses only the former." *Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d at 160. Plaintiffs have alleged, repeatedly, that the titles of the videos they watched, purchased, or downloaded were disclosed to Meta. *See, e.g.,* Comp. ¶ 34 (titles of videos watched by Plaintiffs transmitted to Meta), ¶¶ 37-40 (when user views, purchases, or downloads video on Pond5's website, Meta Pixel transmits URL to Meta which contains title of video and title of video in plain text). To state the obvious, the title of a video such as, for example, "soldiers marching" is easily understood by any ordinary person.

*Id.* ¶¶ 37, 39. Thus, an ordinary person in Meta's position could easily identify the video-viewing behavior of Plaintiffs from the information received by Meta.

### 5. *Plaintiffs Did Not Consent to Pond5's Disclosure of their Personally Identifiable Information*

A video tape service provider, such as Pond5, may disclose a consumer's PII "to any person with the informed, written consent . . . of the consumer." 18 U.S.C. § 2710(b)(2). For consent to be valid, however, it must satisfy a number of specific requirements: (1) the written consent must be "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer;" (2) "at the election of the consumer" the consent must be either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner;" and (3) the video tape service provider must provide "an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." 18 U.S.C. § 2710(b)(2)(B)(i)-(iii).

Plaintiffs have adequately alleged that Pond5 did not receive valid written consent from Plaintiffs. *See* Comp. ¶¶ 2, 53, 59. Defendant does not address Plaintiffs' allegations regarding consent, and the lack thereof, rather it seeks to introduce its Privacy Policy, and to affirmatively establish that Plaintiffs gave valid consent to the disclosure of their PII.

As an initial matter, as the district court found in *Ade v. Viki, Inc.*, even assuming it could consider the "Terms of Use, Privacy Policy, and Cookie Policy," presented by defendant in that case, "[t]he VPPA's consent requirements present factual issues regarding how the alleged consent form was presented to the consumer. In view of the plaintiffs' denial that Viki satisfied those requirements, the Court cannot find based on the pleadings that the plaintiffs gave valid consent to the disclosure of their PII." *Ade v. Viki, Inc.*, No. 23-cv-02161, 2024 WL 1880153, at *3–4 (N.D. Cal. Mar. 28, 2024); *see also Fan v. NBA Properties Inc.*, No. 23-cv-05069-SI, 2024 WL 1297643, at *3 (N.D. Cal. Mar. 26, 2024) (denying motion to dismiss VPPA claim, and holding that it was "premature to decide the question of consent."). Plaintiffs respectfully suggest that the Court should reach a similar conclusion in the instant case.

Even were the Court to consider Defendant's "consent" arguments, the Privacy Policy relied upon by Defendant cannot constitute "informed" written consent. Assuming that consumers consent to the Privacy Policy when they create an account with Pond5, that Policy does not provide notice to consumers, including Plaintiffs, that their PII, within the meaning of the VPPA, will be disclosed to any third party. Defendant cites language in the Privacy Policy which merely notes, in vague terms, that Pond5 uses "identifiers, cookies, and other tracking technologies and electronic network activity, financial and commercial information to . . . provide [users] information and advertisers that [Pond5] believe[s] are relevant to your interests." MTD, p. 22 (quoting McPherson Decl., Ex. L at 3, Ex. M at 4). Defendant then cites the statement in that same Policy that Pond5's website "contains . . . tracking pixels" that "are used to track user behavior," and disclosed to "third parties" such as Facebook." *Id.* (quoting McPherson Decl., Ex. L at 2). And, Defendant notes that the Privacy Policy "directs users to 'learn about [Facebook's] treatment of [users'] personal information and the options they make available for managing such treatment,' directing to a specific settings page and privacy information page on Facebook's website." *Id.* (quoting McPherson Decl., Ex. L at 2). Defendant summarizes the effect of this language as "disclos[ing] that Plaintiffs' usage data may be tracked, disclos[ing] that such data might be used for purposes including advertising, disclos[ing] that such data could be disclosed to Facebook specifically, and provid[ing] information on how to disable the technology." *Id.* But, even if that were an accurate description of the effect of the disclosures made by the Privacy Policy it categorically cannot constitute notice that a consumer's personal identifiers and details of the videos they watch will be shared with Meta or any other unauthorized third party. There is a clear difference between "user behavior" and "usage data," on the one hand, and PII, within the meaning of the VPPA, on the other. The former terms – which could describe any number of types of anonymized or pseudonymized browsing data – are completely inadequate as descriptors of the personal identifiers and records of video views and purchases that were actually disclosed to Meta.

Moreover, even if the Privacy Policy had adequately informed consumers that their PII would be disclosed to Meta – which it categorically did not, Defendant has failed to establish that the so-called consent purportedly given by Plaintiffs meets the **specific requirements** set out by the VPPA. And, <u>failure to meet any of the requirements would mean there was no valid consent</u>.

First, even assuming, *arguendo*, that Plaintiffs agreed to Defendant's Privacy Policy, Defendant offers no evidence to suggest that "at the election of the consumer" the consent purportedly given by Plaintiffs was either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner." 18 U.S.C. § 2710(b)(2)(B)(ii). Defendant acknowledges this requirement but offers no argument that it was met. MTD, p. 20.

And, second, Defendant offers no evidence to suggest that Pond5 provided Plaintiffs or other subscribers with "an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." 18 U.S.C. § 2710(b)(2)(B)(iii). Defendant asserts that Pond5's Privacy Policy provided information to consumers on how to disable the Meta Pixel and that "[b]ecause Plaintiffs chose not to opt out of Pond5's use of the Meta tracking pixel, they necessarily consented to the pixel's disclosure of any PII." MTD, p. 22. Defendant may argue that this is an adequate opt-out under the VPPA. Not so. There is no authority for the suggestion that an opt-out under the VPPA can involve simply providing a link that purportedly informs consumers of steps they can take on their own personal computer to prevent the disclosure of their PII by the video tape service provider. Merely offering a hyperlink "to a specific settings page and privacy information page on Facebook's website" is a completely inadequate alternative. Moreover, because, as discussed above, the Privacy Policy does not actually notify consumers that their PII will be disclosed to third parties, they are unaware that they would need to opt out for the PII not to be disclosed. And, regardless, even the opt-out claimed by Defendant is fundamentally inadequate because it does not offer the required option for a subscriber to withdraw on a case-by-case basis. 18 U.S.C. § 2710(b)(2)(B)(iii).

In short, the Court should decline to consider the issue of consent as part of Defendant's 12(b)(6) motion. Even if the Court considers Defendant's arguments, Defendant has completely failed to establish the several requirements for valid consent under the VPPA.

**C. Leave to Amend**

Should this Court be inclined to grant Defendant's motion to dismiss pursuant to 12(b)(1) or 12(b)(6), Plaintiffs respectfully request that the Court permits them to amend their Complaint to

address any shortcomings identified by the Court. Under Federal Rule of Civil Procedure 15(a)(2), district courts "should freely give leave [to amend] when justice so requires." A district court may deny leave to amend in the presence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Sacerdote v. New York U.*, 9 F. 4th 95, 115 (2d Cir. 2021) (noting that standard set forth under Rule 15(a)(2) "is a 'liberal' and 'permissive' standard, and the only 'grounds on which denial of leave to amend has long been held proper' are upon a showing of 'undue delay, bad faith, dilatory motive, [or] futility.'" (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F. 3d 160, 190 (2d Cir. 2015) (internal quotation marks and citation omitted)). In the instant case, Defendant does not allege that it will suffer any prejudice should Plaintiffs be permitted to amend, nor does it allege undue delay, bad faith, a dilatory motive, or any repeated failure to cure deficiencies. Instead, Defendant implicitly suggests only that leave to amend would necessarily be futile for the same reasons that it believes its 12(b)(6) motion should be granted. Respectfully, this is incorrect. Plaintiffs would be able to adequately address any shortcomings identified by the Court, and it would be inconsistent with Rule 15(a)(2) for this Court to deny leave to amend, especially when Plaintiffs have, at this juncture, not filed an amended pleading.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion should be denied in its entirety.

Respectfully submitted,

Dated: November 1, 2024

/s/ Julian Hammond

JULIAN HAMMOND, SBN# 4008397 (*pro hac vice*)
jhammond@hammondlawpc.com
HAMMONDLAW, P.C.
1201 Pacific Ave, Suite 600
Tacoma, WA 98402
(310) 601-6766 (Office)
(310) 295-2385 (Fax)

*Attorneys for Plaintiffs and the Putative Class*

**CERTIFICATION OF WORD COUNT**

I hereby certify that this brief contains 8,708 words and complies with the Court's Individual Rule 3.C.

/s/ Julian Hammond
JULIAN HAMMOND, SBN# 4008397 (*pro hac vice*)
jhammond@hammondlawpc.com
HAMMONDLAW, P.C.
1201 Pacific Ave, Suite 600
Tacoma, WA 98402
(310) 601-6766 (Office)
(310) 295-2385 (Fax)