**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

MATTHEW NIXON and PETER FLEMING, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

POND5, INC.,

Defendant.

No. 24-cv-05823 (JLR)

**ORAL ARGUMENT REQUESTED**

**REPLY IN FURTHER SUPPORT OF**
**<u>MOTION TO DISMISS CLASS ACTION COMPLAINT</u>**

**GOODWIN PROCTER LLP**

The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel. (212) 813-8800
Fax (212) 355-3333

*Attorneys for Defendant Pond5, Inc.*

# TABLE OF CONTENTS

A. Plaintiffs Lack Standing. 1

B. Plaintiffs' Claim Is Time-Barred. 4

C. The Complaint Does Not State a Claim Under the VPPA. 6

  1. Plaintiffs Do Not Allege Disclosure Of PII. 6

  2. Plaintiffs Consented To Pond5's Use Of Information. 8

D. Leave To Amend Would Be Futile. 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barclift v. Keystone Credit Servs., LLC*,
585 F. Supp. 3d 748 (E.D. Pa. 2022) ....................2

*Cantu v. Tapestry*,
No. 22-cv-1974 (BAS)(DDL), 2023 WL 4440662 (S.D. Cal. July 10, 2023)....................4

*Ciccone v. Flagstar Bank, FSB*,
15-cv-6809 (SJF)(SIL), 2017 WL 10456859 (E.D.N.Y. Jan. 9, 2017) ....................6

*Dodds v. Cigna Sec., Inc.*,
12 F.3d 346 (2d Cir. 1993)....................4

*Ellul v. Congregation of Christian Bros.*,
774 F.3d 791 (2d Cir. 2014)....................5

*Frulla v. CRA Holdings, Inc.*,
596 F.Supp.2d 275 (D. Conn. 2009)....................5

*Ghanaat v. Numerade Labs, Inc.*,
689 F. Supp. 3d 714 (N.D. Cal. 2023) ....................8

*Golden v. NBCUniversal Media, LLC,*
688 F. Supp. 3d 150, 154 (S.D.N.Y. 2023) ....................7

*Heerde v. Learfield Commc'ns, LLC*,
No. 2:23-cv-04493-FLA-MAAx, 2024 WL 3573874 (C.D. Cal. July 19, 2024)....................8

*Jackson v. Wells Fargo Home Mortg.*,
811 F. App'x 27 (2d Cir. 2020) ....................10

*LaFaro v. N.Y. Cardiothoracic Grp., PLLC*,
570 F.3d 471 (2d Cir. 2009)....................9

*McCarthy v. Barrett*,
804 F. Supp. 2d 1126 (W.D. Wash. 2011)....................2

*Osheske v. Silver Cinemas Acquisition Co.*,
700 F. Supp. 3d 921 (C.D. Cal. 2023) ....................2

*Salazar v. Nat'l Basketball Ass'n*,
118 F.4th 533 (2d Cir. 2024) ....................1, 3, 6, 7

*Solomon v. Flipps Media, Inc.*,
No. 22-cv-5508-JMA-JMW, 2023 WL 6390055 (E.D.N.Y. Sept. 30, 2023)............................8

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....................................................................................................1, 3

*United States v. Meregildo*,
883 F. Supp. 2d 523 (S.D.N.Y. 2012)...........................................................................2

*In re Yahoo Mail Litig.*,
7 F. Supp. 3d 1016 (N.D. Cal. 2014) ...........................................................................2

Plaintiffs cannot overcome the reasons their sole VPPA claim fails as a matter of law:

1. Unlike other VPPA cases, Plaintiffs lack standing because of the unique nature of the claim here. Plaintiffs complain about disclosure of videos for which they obtain a commercial license *to display to other audiences*, not to watch in their own homes. That key difference precludes Plaintiffs from characterizing their claim as redressing a harm grounded in the kinds of traditional privacy harms that support standing in other VPPA cases.

2. Plaintiffs' claims are indisputably time-barred. Plaintiffs' response cannot overcome the clear and accurate disclosures in Pond5's Privacy Policy—disclosures that, at the very least, put Plaintiffs on notice of their claim. Because Plaintiffs failed to take basic steps to investigate their claim in the many years since the alleged VPPA violation, their claim is barred.

3. Unlike other VPPA plaintiffs, Plaintiffs here only allege that Pond5 discloses their *encrypted* Facebook IDs. Encrypted IDs are not personal information for purposes of the VPPA.

4. The clear and accurate disclosures in Pond5's Privacy Policy, which Plaintiffs indisputably accepted, also establish that Plaintiffs consented to the tracking they challenge.

For any of these reasons, the Complaint should be dismissed with prejudice.

**A. Plaintiffs Lack Standing.**

Plaintiffs' case for standing rests on the Supreme Court's holding that standing can exist where a plaintiff suffers harm grounded in "disclosure of private information" or "intrusion upon seclusion," "historical or common-law analogue[s]" to traditional privacy harms. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424-25 (2021). Yet Plaintiffs do not allege such a harm: the Complaint challenges disclosure of their viewing stock videos from a website for professional content creators who purchase commercial licenses to re-display media assets to other audiences. (*See* ECF 1 ¶ 16; ECF 18-1 at 1.) This critical fact distinguishes the Complaint from VPPA cases finding standing, including the Second Circuit's most recent decision in *Salazar v. Nat'l*

*Basketball Ass'n*, 118 F.4th 533, 537 (2d Cir. 2024): not one of those cases involved a plaintiff who viewed videos for re-display to other public audiences.

Plaintiffs do not—and cannot—deny this fundamental factual difference in their case. Plaintiffs do not deny that Pond5's website offers commercial licenses to "filmmakers, media organizations, and marketers worldwide" to use stock videos and video templates to re-display media assets to the public. (*See* ECF 18-1 at 1, ECF 18-14 at 1, ECF 18-15 at 1-2.) Instead, they merely complain that Pond5 is "insert[ing] . . . allegations" into the Complaint. (ECF 20 at 5.) But by citing to its website content, Pond5's motion provides critical context from which Plaintiffs attempt to hide. And Plaintiffs cannot object to the Court's consideration of Pond5's website. To the contrary, they cite portions of Pond5's website (ECF 20 at 12-14), and they refer to other information from Pond5's website not included in the Complaint (*id.*).

Unable to deny this key difference between their case and other VPPA cases, Plaintiffs challenge Pond5 to cite a case denying standing based on allegations such as theirs. (ECF 20 at 4.) Pond5 acknowledges it is raising an issue of first impression, but only because the allegations here differ from those in any other VPPA decisions. (*See* ECF 17 at 8-9.) Plaintiffs also fail to distinguish *Osheske v. Silver Cinemas Acquisition Co.*, 700 F. Supp. 3d 921, 927 (C.D. Cal. 2023); *In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1041 (N.D. Cal. 2014); or *Barclift v. Keystone Credit Servs., LLC*, 585 F. Supp. 3d 748, 759 (E.D. Pa. 2022). While those cases did not deny standing to pursue VPPA claims, they establish that the VPPA was intended to protect the dissemination of private information, and that standing extends only to claims concerning the dissemination of private information. Again, Plaintiffs do not deny that the information allegedly disclosed concerns their viewing of videos for re-publication to the public. Cases such as *McCarthy v. Barrett*, 804 F. Supp. 2d 1126, 1145 (W.D. Wash. 2011), and *United States v.*

*Meregildo*, 883 F. Supp. 2d 523, 525 (S.D.N.Y. 2012), support the point that dissemination of such information does not implicate privacy concerns. No case Plaintiffs cite suggests otherwise.

And Plaintiffs themselves cannot cite a single case finding Article III standing based on allegations related to viewing commercial video *for re-publication*. The VPPA cases they cite were all decided on other facts, and the Supreme Court rejected Plaintiffs' suggestion that standing can be determined based on alleged violations of a statute writ large. (ECF 20 at 3-4.) As *TransUnion* held, standing must be determined based on each plaintiff's unique claims—even as to plaintiffs suing under the same statute. 594 U.S. at 433. Where, as here, Plaintiffs cannot allege an invasion of a privacy interest, they lack standing.

The Second Circuit's decision in *Salazar* does not suggest otherwise. (ECF 20 at 6-7.) While the Second Circuit noted that Salazar's "core alleged harm—that his personal information was disclosed to a third party, without his consent, in violation of the VPPA" satisfied the Article III requirement, the court's holding did not consider the facts alleged here. 118 F.4th at 537 (concerning videos viewed on NBA.com). Plaintiffs are therefore incorrect in describing their allegations as "substantively identical to those considered . . . by the Second Circuit." (ECF 20 at 7.) Indeed, unlike in *Salazar*, this case does not involve what the Second Circuit describes as "the public disclosure of private facts," 118 F.4th at 541, but rather the alleged disclosure of commercial facts. And as Plaintiffs recognize (ECF 20 at 7), the Second Circuit considered "the nature of the companies involved" to determine standing, *Salazar*, 118 F.4th at 544, supporting Pond5's argument that Plaintiffs' viewing of stock videos on its website to obtain commercial licenses to republish such videos should carry significant weight in the standing analysis.

Plaintiffs' suggestion that the Court address standing as a merits argument (ECF 20 at 7-8) misreads Pond5's argument. Pond5's standing argument is that even if Plaintiffs could satisfy

the elements of a VPPA claim, they lack standing to pursue such a claim because of the unique context here. In *Cantu v. Tapestry*, the case Plaintiffs cite to support their "merits-as-standing" view (ECF 20 at 8), defendants argued that the plaintiff had not "suffered an injury-in-fact because his PII was not disclosed." 2023 WL 4440662, at *5. That *is* a merits argument because it asks whether the statutory definition of PII was in fact disclosed. Pond5's argument is that even if PII, as the VPPA defines it, was disclosed, it is not the kind of PII that supports *these particular Plaintiffs'* standing to sue.

**B. Plaintiffs' Claim Is Time-Barred.**

Plaintiffs do not refute that their last purchases from Pond5's website—and thus any disclosure of those purchases allegedly in violation of the VPPA—occurred more than two years from the date that they filed the Complaint: in or about September 2021 for Nixon and October 2020 for Fleming. (ECF 17 at 12 (citing ECF 1 ¶¶ 50, 56).) Nor do they refute that there is no allegation in the Complaint that they viewed any videos after 2021. (*Id.*) Plaintiffs do not challenge the applicability of Pond5's Privacy Policy to them. (*See* ECF 20 at 9-10.) And Plaintiffs do not argue that the tools they used to analyze Pond5's website were not available to them within two years of their purchases—merely that they did not use those tools sooner. (*Id.* at 10.) Based on these admissions, Plaintiffs' claims are indisputably time-barred.

The discovery rule does not save Plaintiffs' claim. (ECF 17 at 14.) Plaintiffs' argument turns on the premise that they were "blamelessly ignorant" because Pond5's Privacy Policy did not notify them that "their personal identifiers and details of their video-viewing habits[] will be disclosed to Meta." (ECF 20 at 9-10.) That premise is wrong, both on the law and the facts.

Plaintiffs' claims are time-barred if they "had constructive notice of facts sufficient to create a duty to inquire further into that matter." *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 352 (2d Cir. 1993). The only case Plaintiffs cite applying the discovery rule (ECF 20 at 9), dismissed the

complaint after finding that plaintiffs could have "inquired into and discovered the relevant facts long before" their claims were time-barred. *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 802 (2d Cir. 2014). (*Frulla v. CRA Holdings, Inc.*, 596 F.Supp.2d 275, 289 (D. Conn. 2009) (ECF 20 at 9), held that plaintiff did not discover his ERISA claim until receiving a letter saying he would need to make contributions to a trust; Plaintiff cannot allege anything analogous.)

Pond5's Privacy Policy more than satisfies this inquiry notice standard. Pond5 expressly tells users: "you consent to our collection, use, processing and sharing of your personal information/data in accordance with this policy." (ECF 18-12 at 1.) Pond5 then explains that it uses tracking pixels to "track user behavior" for purposes of advertising, including through "third party websites" like "Facebook." (*Id*. at 2) And Pond5 suggests that users "learn about [Facebook's] treatment of your personal information and the options they make available for managing such treatment." (*Id*.) Once Plaintiffs knew that their website usage (viewing and downloading of videos) was being tracked, and that their information could be disclosed to Meta, Plaintiffs had a duty to inquire further. Plaintiffs' failure to do so bars their claims.

The fraudulent concealment doctrine likewise does not save Plaintiffs' claim. (ECF 20 at 10-11.) Plaintiffs conflate an alleged violation of the VPPA with fraud. Yet as discussed further below (*see infra*, at 9-10), Pond5's Privacy Policy was accurate in all respects, belying Plaintiffs' allegations regarding the lack of consent. And Plaintiffs cite no authority for their assertion that a "fail[ure] to seek informed consent or to otherwise notify Plaintiffs" of a disclosure of their information is inherently fraudulent conduct. (ECF 20 at 11.) Where, as here, Plaintiffs' claim of a statutory violation is based on nondisclosure of information to consumers, "courts have held uniformly that fraudulent conduct *beyond the nondisclosure itself* is necessary to equitably toll the running of the statute of limitations," because allowing the same nondisclosure to give rise to

a violation and toll the statute of limitations would "nullif[y]" the "effect of the statute of limitations[.]" *Ciccone v. Flagstar Bank, FSB*, 15-cv-6809 (SJF)(SIL), 2017 WL 10456859, at *8 (E.D.N.Y. Jan. 9, 2017) (citations omitted).

**C. The Complaint Does Not State a Claim Under the VPPA.**

Pond5 withdraws its argument that it is not a videotape service provider. That argument was based on case law before the Second Circuit's decision in *Salazar* (*see* ECF 17 at 15-17), which was decided after Pond5's motion. Pond5 recognizes that *Salazar* precludes application of that case law in this Circuit. Plaintiffs' VPPA claim nevertheless still fails on the merits, because they cannot allege the disclosure of PII and because they consented to any such disclosure.

**1. Plaintiffs Do Not Allege Disclosure Of PII.**

Plaintiffs cannot allege that Pond5 discloses their *un*encrypted Facebook IDs, or that their Facebook profiles have identifying information. Plaintiffs do not meaningfully engage with this shortcoming. Instead, Plaintiffs rely on hypothetical allegations concerning unnamed putative class members and generalized, abstract statements about Facebook and information that could be accessible by some disclosure not alleged here.

Carefully parsing Plaintiffs' allegations exposes their inability to plead an actionable disclosure of PII. Plaintiffs allege that they "owned" a Facebook account that they have "used" during the time they used Pond5's website. (ECF 1 ¶¶ 7-8.) Yet they do not allege they were *logged in* to their Facebook accounts when they were using Pond5's website. This distinction is critical based on Plaintiffs' own description of the way cookies are transmitted through the Meta Pixel: someone logged in to Facebook while "watching or downloading a video on Pond5's website will transmit the [unencrypted] c_user cookie to Facebook." (*Id.* ¶ 41.) But someone *not* logged in to Facebook will transmit "a smaller set of cookies," including "an *encrypted* Facebook ID." (*Id.* ¶¶ 44-45 (emphasis added).) Because they do not allege that they were logged

in to Facebook while using Pond5's website, Plaintiffs can allege only that "on information and belief, Defendant discloses to Facebook [their] Facebook ID," without specifying that the Facebook ID is encrypted. (*Id.* ¶¶ 52, 58.) That the Facebook IDs allegedly disclosed were encrypted matters: Plaintiffs only allege that an *un*encrypted Facebook ID is PII. (*See id.* ¶ 42.)

Nowhere in the Complaint or their Opposition do Plaintiffs assert that they were logged in to Facebook when using Pond5's website. (*See* ECF 20 at 17.) Instead, Plaintiffs insist they allege "that '[t]he cookies that were transmitted as a result of the Meta Pixels that [Pond5] installed on its website conveyed Plaintiffs' . . . Facebook IDs (through the c_user cookie).'" (*Id.* (citing ECF 1 ¶ 35).) The ellipses in that sentence obscure that this allegation concerns purported "Class Members," not just the named plaintiffs. (ECF 1 ¶ 35.) Plaintiffs cannot evade dismissal based on allegations about unnamed class members. (ECF 17 at 18.)

Plaintiffs' reliance on *Golden v. NBCUniversal Media, LLC*, proves Pond5's point: there, the plaintiff used the website and mobile app "while concurrently logged into her Facebook account." 688 F. Supp. 3d 150, 154 (S.D.N.Y. 2023); *see also Salazar*, 118 F.4th at 538 (plaintiff "watched NBA.com videos 'while logged into his Facebook account'").

Even if Plaintiffs could allege that their unencrypted Facebook IDs were transmitted, that too would be insufficient to demonstrate that PII was disclosed. Here again, Plaintiffs assert only generic allegations about Facebook to distract from what's missing in their pleading specific to the named Plaintiffs. For example, Plaintiffs insist that "[a]nyone can identify a Facebook profile and all personal information publicly listed on that profile, including a person's first and last name[,] by appending the Facebook ID to the end of Facebook.com." (ECF 1 ¶ 42.) But Plaintiffs do not allege that *their* names are included in their Facebook profiles. At most, Plaintiffs allege, citing to a news article, that "Facebook describes itself as a 'real identity

platform.'" (*Id.* ¶ 26.) This does not substitute for an allegation, which Plaintiffs would obviously have the knowledge to make if true, that their names are included in their Facebook profiles.

Plaintiffs also ignore the cases holding that a "complaint does not adequately allege that [disclosing their Facebook IDs] results in sharing of any personal information" without alleging that Plaintiffs' "Facebook pages contain any personal information." *Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 720 (N.D. Cal. 2023); *see also Heerde v. Learfield Commc'ns, LLC*, No. 2:23-cv-04493-FLA-MAAx, 2024 WL 3573874, at *4 (C.D. Cal. July 19, 2024) (dismissing VPPA claim for failure to allege Facebook pages contained Plaintiffs' viewable PII); *Solomon v. Flipps Media, Inc.*, No. 22-cv-5508-JMA-JMW, 2023 WL 6390055, at *3 (E.D.N.Y. Sept. 30, 2023) ("Plaintiff needed to allege that her public Facebook profile page contained identifying information about her in order to state a plausible claim.").

**2. Plaintiffs Consented To Pond5's Use Of Information.**

While Plaintiffs ask the Court to find that consent is a fact issue for another day, there is no reason to delay the inevitable conclusion that Plaintiffs did, in fact, consent to tracking technologies in this case. Plaintiffs do not deny that to purchase videos from Pond5, they necessarily created a user account. Nor do they deny that in creating their respective accounts, they agreed to the Pond5 Privacy Policy. The documents Pond5 cited in its motion conclusively establish that Plaintiffs agreed to the policy and practices at issue here. Plaintiffs make no attempt to address the case law affirming that their agreement to a policy is valid and enforceable when it is provided with sign up. (ECF 17 at 21.) Plaintiffs also do not object to the Court's consideration of Pond5's Privacy Policy. And it is Plaintiffs, not Pond5, who introduced Pond5's Privacy Policy into the pleadings. (*See* ECF 1 ¶ 63 ("Defendant's Privacy Policy does not inform … customers that their [PII] will be disclosed to unauthorized third parties such as Meta[.]").)

Faced with these irrefutable facts, Plaintiffs' argument that they "adequately alleged that

Pond5 did not receive [their] valid written consent" rests on nothing more than the Complaint's barebones allegations. (ECF 20 at 18.) Plaintiffs' conclusory allegation that any disclosure was "without their consent," (ECF 1 ¶¶ 5, 33) or bald recitation of the statutory language to allege that Pond5 "does not seek, let alone receive, 'informed, written consent' from Plaintiffs and other Class Members" (*id.* ¶ 82), is insufficient. *See LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009) (discounting allegations on a motion to dismiss that offer "a legal conclusion couched as a factual allegation").

Plaintiffs are wrong in how they characterize the Privacy Policy, which plainly notifies them of the very practices they now challenge. Plaintiffs complain that their PII was transmitted to Facebook via cookies. The Privacy Policy explains that Pond5 uses "cookies" to "provide [users'] information and advertisements that [Pond5] believe[s] are relevant to [their] interests." (ECF 18-12 at 3.) Pond5 also notes that the company "may disclose your personal information to third-party service providers who perform services on our behalf." (*Id.*) And one such "third party advertisement service provider" that Pond5 specifically identified is Facebook. (*Id.* at 2.) The Privacy Policy also discloses the use of a Meta tracking pixel to track "user behavior" and invites users to "learn about [Facebook's] treatment of [users'] personal information and the options they make available for managing such treatment." (*Id.*)

Plaintiffs' description of Pond5's website undermines their quibble that "user behavior" and "usage data" could describe "any number of types of anonymized or pseudonymized browsing data." (ECF 20 at 19.) Plaintiffs describe Pond5's website as dedicated nearly entirely to videos. (*See* ECF 20 at 13-14.) Given that, Plaintiffs offer no explanation for what "user behavior" and "usage" could be, if not viewing and downloading videos.

Nothing about the manner in which Plaintiffs consented to Pond5's practices is

inconsistent with a valid VPPA disclosure, notwithstanding Plaintiffs' arguments about the timing of Pond5's disclosures, or their ability to opt out of Pond5's practices. (ECF 20 at 20.) As for timing, Plaintiffs allege that their information was disclosed when they purchased pre-recorded videos from Pond5's website. (ECF 1 ¶¶ 50, 52, 56, 58.) Plaintiffs do not dispute that in order to purchase videos, they created an account; by doing so, they consented to tracking.

Likewise, the Privacy Policy discloses how to opt out of third-party advertising cookies, and to manage Facebook's treatment of information received from tracking pixels. (ECF 17 at 22; ECF 18-12 at 2.) Plaintiffs challenge that opt-out choice by arguing that providing a hyperlink to the settings and Facebook's website is insufficient as a matter of law, but they offer nothing to support that assertion. (ECF 20 at 20.) And while Plaintiffs complain they have no "option … to withdraw [consent] on a case-by-case basis," (*id.*), that is simply not correct: any user can adjust their cookie or Facebook preferences at any time, allowing someone to reject cookies or use of information disclosed to Facebook before downloading a particular video and then accepting cookies or adjusting Facebook settings again thereafter.

**D. Leave To Amend Would Be Futile.**

Plaintiffs do not deny the pleading deficiencies raised in Pond5's motion: (i) videos on Pond5's site are used for commercial purposes and republished to an audience; (ii) they do not allege they were logged into their Facebook accounts when they used Pond5's website; (iii) and their Facebook accounts do not contain their personal information. Nor do Plaintiffs state what they would instead allege in an amended pleading to overcome those shortcomings. Under these circumstances, leave to amend would be futile. *Jackson v. Wells Fargo Home Mortg.*, 811 F. App'x 27, 30 (2d Cir. 2020) (denying leave to amend when plaintiff "identifies no new facts that would cure the [complaint's] deficiencies").

For all of these reasons, the Court should dismiss the Complaint with prejudice.

Dated: November 22, 2024
New York, New York

**GOODWIN PROCTER LLP**

By: /s/ *Mark David McPherson*
Mark David McPherson
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel. (212) 813-8800
Fax (212) 355-3333
mmcpherson@goodwinlaw.com

W. Kyle Tayman (admitted *pro hac vice*)
901 New York Avenue NW
Washington, DC 20001
Tel. (202) 346-4000
Fax (202) 346-4444

*Attorneys for Defendant Pond5, Inc.*

## CERTIFICATION OF WORD COUNT

I hereby certify that this brief contains 3,332 words and complies with the Court's Individual Rule 3.C.

/s/ *Mark David McPherson*
Mark David McPherson
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel. (212) 813-8800
Fax (212) 355-3333
mmcpherson@goodwinlaw.com